Antoine B. RINIERI, Plaintiff,

v.

Thomas E. SCANLON, District Director of Internal Revenue for the District of Brooklyn, New York, Defendant.

No. 63 Civ. 3279.

United States District Court
S. D. New York.

April 20, 1966.

Joy, Hallinan & Finn, New York City, for plaintiff, C. Joseph Hallinan, Jr., Harris, Witlin & Fishkin, Saul L. Harris and Jesse Fishkin, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., for defendant, Arthur S. Olick, Asst. U. S. Atty., of counsel.

LEVET, District Judge.

This is an income tax refund action. It was assigned to me for all purposes under Rule 2, General Rules of the Southern and Eastern Districts of New York. Plaintiff has moved for summary judgment.

The action grows out of the fact that on June 18, 1962, plaintiff was found to have in his possession at Idlewild Airport, New York, New York, the sum of $247,500 in United States currency. Plaintiff is a French citizen and landed at New York as a passenger on a flight which departed from Chicago, Illinois, and was scheduled to terminate in Zurich, Switzerland.

Once it was learned that plaintiff had the sum of money in his possession, it is undisputed that the following actions were taken:

1. On June 18, 1962, the Federal Narcotics Bureau seized the money ($247,500) in the hands of plaintiff and turned it over to the Internal Revenue Service (IRS).

2. On June 21, 1962, allegedly pursuant to Section 6861, Internal Revenue Code of 1954, a jeopardy assessment in the amount of $247,820 was levied against plaintiff and his assets.

3. On or about June 25, 1962, the District Director notified plaintiff in writing that:

(a) Plaintiff had concealed his property in order to hinder collection of income taxes justly due and to become due for the period January 1, 1962 to June 21, 1962.

(b) In accordance with Section 6851 of the Internal Revenue Code of 1954, the Director immediately terminated the taxable year of plaintiff beginning January 1, 1962 and ending June 21, 1962 and declared the income taxes therefor immediately due and payable.

(c) The taxes due for the period were $247,820, which amount was to be paid immediately. (See Pl. Ex. J, 9/26/65)

4. On or about June 21, 1962, the Director, allegedly pursuant to Section 6020, Internal Revenue Code of 1954, filed a so-called "Dummy" return for plaintiff, Form 1040B, "U. S. Non-Resident Alien Income Tax Return." The "Dummy" return and accompanying papers showed taxes due for the period from January 1, 1962 through June 21, 1962 in the sum of $247,820.

5. On August 23, 1962, the Director acknowledged receipt of $247,500. On October 26, 1962, a refund of $10,000 was made to plaintiff.

6. On December 27, 1962, plaintiff executed a "U. S. Departing Alien Income Tax Return" showing no income earned in the United States and no tax due.

7. Plaintiff duly filed a claim for refund for the entire amount in the hands of the government, which was denied, and thereafter plaintiff duly instituted this action.

### STATUTES

The statutes involved herein are as follows:

1. Sections 6851(a) (1) and (d), Internal Revenue Code of 1954, which are as follows:

"§ 6851. Termination of taxable year

"(a) Income tax in jeopardy.—

"(1) In general—If the Secretary or his delegate finds that a taxpayer designs quickly to depart from the United States or to remove his property therefrom, or to conceal himself or his property therein, or to do any other act tending to prejudice or to render wholly or partly ineffectual proceedings to collect the income tax for the current or the preceding taxable year unless such proceedings be brought without delay, the Secretary or his delegate shall declare the taxable period for such taxpayer immediately terminated, and shall cause notice of such finding and declaration to be given the taxpayer, together with a demand for immediate payment of the tax for the taxable period so declared terminated and of the tax for the preceding taxable year or so much of such tax as is unpaid, whether or not the time otherwise allowed by law for filing return and paying the tax has expired; and such taxes shall thereupon become immediately due and payable. In any proceeding in court brought to enforce payment of taxes made due and payable by virtue of the provisions of this section, the finding of the Secretary or his delegate, made as herein provided, whether made after notice to the taxpayer or not, shall be for all purposes presumptive evidence of jeopardy.

\* \* \* \* \* \*

"(d) Departure of alien.—Subject to such exceptions as may, by regulations, be prescribed by the Secretary or his delegate—

"(1) No alien shall depart from the United States unless he first procures from the Secretary or his delegate a certificate that he has complied with all the obligations imposed upon him by the income tax laws.

"(2) Payment of taxes shall not be enforced by any proceedings under the provisions of this section prior to the expiration of the time otherwise allowed for paying such taxes if, in the case of an alien about to depart from the United States, the Secretary or his delegate determines that the col-

lection of the tax will not be jeopardized by the departure of the alien."

2. Sections 6861(a) and (b), Internal Revenue Code of 1954, which are as follows:

"§ 6861. Jeopardy assessments of income, estate, and gift taxes

"(a) Authority for making.—If the Secretary or his delegate believes that the assessment or collection of a deficiency, as defined in section 6211, will be jeopardized by delay, he shall, notwithstanding the provisions of section 6213(a), immediately assess such deficiency (together with all interest, additional amounts, and additions to the tax provided for by law), and notice and demand shall be made by the Secretary or his delegate for the payment thereof.

"(b) Deficiency letters.—If the jeopardy assessment is made before any notice in respect of the tax to which the jeopardy assessment relates has been mailed under section 6212(a), then the Secretary or his delegate shall mail a notice under such subsection within 60 days after the making of the assessment."

(3) Section 6020, Internal Revenue Code of 1954, which is as follows:

"§ 6020. Returns prepared for or executed by Secretary

"(a) Preparation of return by Secretary.—If any person shall fail to make a return required by this title or by regulations prescribed thereunder, but shall consent to disclose all information necessary for the preparation thereof, then, and in that case, the Secretary or his delegate may prepare such return, which, being signed by such person, may be received by the Secretary or his delegate as the return of such person.

"(b) Execution of return by Secretary.—

"(1) Authority of Secretary to execute return—If any person fails to make any return (other than a declaration of estimated tax required under section 6015 or 6016) required by any internal revenue law or regulation made thereunder at the time prescribed therefor, or makes, willfully or otherwise, a false or fraudulent return, the Secretary or his delegate shall make such return from his own knowledge and from such information as he can obtain through testimony or otherwise.

"(2) Status of returns—Any return so made and subscribed by the Secretary or his delegate shall be prima facie good and sufficient for all legal purposes."

The government also cites Sections 861 (a) (3) and 871(c), Internal Revenue Code of 1954.

PROOF OF THE PLAINTIFF

On this motion plaintiff has submitted his own affidavit, sworn to January 27, 1964; a lengthy deposition of plaintiff taken in Paris, France at the instance of the United States; and certain documentary exhibits. The plaintiff's testimony is substantially as follows:

1. On June 12, 1962, plaintiff arrived in New York City by air from Paris, France. He brought with him cash of approximately $247,000 which he said represented what he had earned over a period of time buying and selling art.

2. Plaintiff came to the United States in order to buy an art object. He hoped to purchase same from a Mr. Anderson.

3. After arriving at Idlewild at 7:30 P.M. on June 12, 1962, plaintiff went to the Plaza Hotel at Fifth Avenue and 59 Street, registered and deposited this money in a safe deposit box at the hotel.

4. Rinieri went to the "21" Club after registering at the Plaza. Here he had an appointment with the prospective vendor. No one appeared. He remained at the "21" Club until 10:30 P.M., paid his check and returned to the Plaza.

5. The next day, June 13, 1962, plaintiff traveled by air from Newark Airport, Newark, New Jersey, to Charlotte, North Carolina via Eastern Airlines, arriving at Charlotte at 9:05 A.M., and

then going from Charlotte to Asheville, where he arrived at 10:15 A.M.

6. In Asheville plaintiff stayed with a friend, one Gennett, as a guest from June 13 to June 18, 1962. Gennett introduced plaintiff to the Wachovia Bank in Asheville, where plaintiff put the money into a safe deposit box registered in the joint names of plaintiff and Gennett.

7. On June 18, 1962 plaintiff flew from Asheville to Chicago and there boarded a Swiss airplane which was to fly via Montreal, Canada to Zurich, Switzerland. The plane was rerouted to New York. That evening plaintiff had in his possession $247,500 in United States currency. Plaintiff was arrested at Idlewild Airport.

The affidavit and the deposition are generally consistent. The government goes to some lengths to point out alleged inconsistencies, but it is far from clear that the various statements are inconsistent. In my view they do not conflict. Moreover, the government points to no inconsistency in the material portions of the testimony—whether the money was earned here or brought in with plaintiff, what plaintiff's purpose was in coming to this country, and what plaintiff's actions and movements were while in this country.

In further support of his position, plaintiff offers, among other documents, various letters from airlines confirming that "Antoine Rinieri" traveled upon their flights at certain of the times stated in his testimony. Plaintiff also produces a letter from the Plaza Hotel reciting that an "Antoine Rinieri" registered there on June 12, 1962 and departed on June 13, 1962, and a receipt for a safety deposit box at the Wachovia Bank and Trust Company, Asheville, North Carolina, dated June 13, 1962, issued in the name of A. Rinieri or N. C. W. Gennett, Jr. A certain deposition of one Gaffney, a federal narcotics official, is also produced.

PROOF OF THE GOVERNMENT

The government relies largely on the assessment made by the Director and the return which was filed for Mr. Rinieri. While it is true that such assessment on trial would be prima facie proof of the tax due, this court's examination of the revenue agent who prepared the Dummy return for Mr. Rinieri wholly nullified any presumption of correctness to which the assessment and Dummy return might otherwise be entitled. The Revenue Agent testified in substance that he did not know whether Mr. Rinieri earned any money here; that his only information was that Rinieri was found with the money at the airport and that Rinieri refused to answer certain questions; that he was instructed to prepare a return showing a tax of approximately $247,500 due and he therefore did so; and that the $53,100 cost-of-living income figure was a pure fiction constructed in order to make the tax due come out close to $247,500, the amount found in plaintiff's possession. The agent testified in addition that he knew of no further information in the files of IRS, other than that already stated, pertaining to the earning of the money in this country by Mr. Rinieri.

The reports, also prepared by this Agent, which accompany the Dummy return recite that unnamed agents of the Bureau of Narcotics "believe" these funds represent the proceeds from the sale of narcotics in the United States by the taxpayer, as well as the fact that the taxpayer was then serving a jail term for contempt in failing to answer certain questions before a Grand Jury in the Eastern District of New York pertaining to the money. Specific "information" as to the earning of the money in the United States is nowhere alleged or set forth.

The government also claims that the plaintiff has a bad record. Most of these allegations are wholly unsubstantiated or are not substantiated in conformity with the requirements of Rule 56(e), Fed.R.Civ.P. They are not on personal knowledge or duly certified documents. I do not consider them. Rinieri does admit to one conviction involving stolen checks in 1950, but that conviction was "amnestied" due to serv-

ice in the French underground and his imprisonment by the Axis powers during World War II, and apparently is expunged from all judicial records. (See Pl. Exs. 5–7, January 18, 1965) Plaintiff also admits to being fined for having a firearm in his house after his return from the trip to America involved herein. (Dep. 112) Finally, the government points to the fact that plaintiff was sentenced to and served six months in prison for contempt of court in 1962. He refused to answer two questions before a Grand Jury and before Judge Bruchhausen of the Eastern District of New York. The questions related to the name of the man in Switzerland with whom Rinieri stated he stored the money prior to coming to this country and the name of the man Rinieri hoped to meet at the "21" Club on the evening of his arrival. Rinieri declined to answer on the ground of business confidence and was held in contempt. His conviction was affirmed by the Second Circuit, United States v. Rinieri, 308 F.2d 24 (2nd Cir.), cert. denied 371 U.S. 935, 83 S.Ct. 310, 9 L.Ed. 2d 272 (1962).[1]

The sum and substance of the situation is this, then: While pointing to not one iota of proof that any of this money was earned within the United States, although approximately 46 months for investigation have passed since the money was seized, the government contends that a jury would be entitled to disbelieve the plaintiff's story.[2] With this argument I must emphatically disagree.

■ The cases are, of course, replete with statements that mere conclusory af-fidavits which assert that issues of fact exist are insufficient to defeat well-grounded motions for summary judgment. See, e. g., Dressler v. M/V Sandpiper, 331 F.2d 130 (2nd Cir. 1964) (Kaufman, J.). As was said by Chief Judge (now Circuit Judge) Anderson in Boyce v. Merchant's Fire Insurance Co., 204 F.Supp. 311 (D.Conn.), aff'd per curiam, 308 F.2d 806 (2nd Cir. 1962):

"It is not enough that one opposing a motion claims there is a genuine issue of material fact; some evidence showing the existence of such an issue must be presented." (204 F.Supp. at 314)

And as is pointed out at 6 Moore, Federal Practice, ¶ 56.15[3], pp. 2346–2347 (2nd ed., 1965 rev.):

" * * * [T]he opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, nor merely suspicious."

See also Belinsky v. Twentieth Restaurant, Inc., 207 F.Supp. 412 (S.D.N.Y. 1962).

■ The government presses its credibility point, however. It is true that under some circumstances an issue with respect to the credibility of one of movant's "witnesses" may defeat a motion for summary judgment. See Arnstein v. Porter, 154 F.2d 464 (2nd Cir. 1946). However, I believe the present case to come within a complementary line of cases, epitomized by Radio City Music Hall Corp. v. United States, 135 F.2d 715 (2nd Cir., 1943) (L. Hand, J.); Dyer v. MacDougall, 201 F.2d 265 (2nd Cir. 1952) (L. Hand, J.); Lavine v. Shapiro,

---

1. It is fair to state that had the appeal been heard after December 6, 1965, the contempt conviction might well have been reversed. See Harris v. United States, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965).

2. The government unabashedly makes this argument although immediately after release from jail on the contempt charges Mr. Rinieri was deported as an undesirable alien, apparently due to the 1950 check incident (of which he had been pardoned as heretofore stated), and is apparently excluded from the country to this day. His attorney states on personal knowledge that on July 30, 1963 Mr. Rinieri applied for reentry into the United States for the specific purpose of litigating this action and certain related defamation actions. On September 3, 1963, Mr. Rinieri's application was denied. An appeal from this denial was also denied on October 15, 1963. The government does not deny any of this.

I note solely in order to place the situation in context, that on January 15, 1964 the government filed a demand for jury trial in this case. No such demand has ever been filed by plaintiff.

257 F.2d 14 (7th Cir. 1958). See also Orvis v. Brickman, 90 U.S.App.D.C. 266, 196 F.2d 762 (1952); United States for Use of Kolton v. Halpern, 260 F.2d 590 (3rd Cir. 1958). All these cases support the proposition, applicable here, that the party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and that the opposing party may not merely recite the incantation, "Credibility," and have a trial on the hope that a jury may disbelieve factually uncontested proof. This is all the more true where, as here, the opposing party has had an opportunity to examine the moving party at length under oath, and where the government has had the opportunity for the last 46 months to utilize its full investigative resources. Indeed, it is admitted that plaintiff was under surveillance before he left France and at least part of the time while he was here (Gaffney deposition and Olick affidavit). It is uncontested that plaintiff was questioned nearly all night when first arrested. His statements, both shortly after arrest and since that time, have been quite extensive, and could have been investigated. This court has even granted a two-month delay in proceedings in this matter pursuant to Rule 56(f), Fed.R.Civ.P., in order to allow some fifty Treasury Agents to attempt to trace the money which plaintiff had in his possession, the serial numbers of which the government had obtained. This attempt, however, produced no information of aid to the government. Neither can the government on these facts rely on lack of access to proof as a basis for opposing this motion. See Schneider v. McKesson & Robbins, 254 F.2d 827 (2nd Cir. 1958); 6 Moore, Federal Practice, ¶ 56.15[4], p. 2364 (2nd ed., 1965 rev.). Under these circumstances I adhere to the rule as contained in the cases cited above and stated by Moore, as follows:

"* * * It is also clear that the opposing party is not entitled to have the motion denied on the mere hope that at trial he will be able to discredit movant's evidence; he must, at the hearing, be able to point out to the court something indicating the existence of a triable issue of material fact." 6 Moore, supra, ¶ 56.15[4], pp. 2371–2372 (end ed., 1965 rev.).

Moreover, the existence of the sections of the Internal Revenue Code heretofore set forth does not prevent the granting of summary judgment herein.

The government in its memorandum upon this motion concedes: "Section 6851 confers no assessment authority but it does provide that the findings of the district director shall be presumptive evidence of jeopardy." Yet it is clear that if there are no taxes due there can be no "jeopardy."

Further, it has appeared, as recited above, that the Dummy return itself was not based upon any factual information furnished by anyone. It was purely fictitious. Nor is it subscribed by the Secretary or his delegate, or required by Section 6020. On the state of the proof herein, I am forced to conclude that the Revenue Agent's testimony set forth below reveals the true nature of the government's actions:

"Q. To be very blunt about it, isn't it the fact that you were just merely told to write a report that would come out with an income tax of approximately $247,500 so that the government would have a basis of seizing this money, isn't that the blunt fact?

"A. That would be part of it. My position is to protect the government.

"Q. I want an answer, yes or no, Mr. Vita. Isn't that the blunt fact?

"A. Yes." (Tr. 15–16)

The government has acted in a fashion which can only be described as arbitrary, capricious and unconscionable. The government, after ample time for inquiry, can produce not one shred of proof that the money was earned in the United States. On such a record at trial I would

have to grant a directed verdict for plaintiff. I must grant summary judgment for plaintiff here, since I find that no genuine issue of material fact exists.

Settle judgment on notice.