Emilio **PIZZARELLO**, Appellant,

v.

**UNITED STATES** of America, Edward J. Fitzgerald, Jr., District Director of Internal Revenue for the District of Manhattan, and Sheldon Cohen, Commissioner of Internal Revenue of the United States of America, Respondents.

No. 110, Docket 32532.

United States Court of Appeals
Second Circuit.

Argued Oct. 15, 1968.

Decided March 18, 1969.

---

8. Board of Com'rs of Jackson County v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1939).

James G. Starkey, Brooklyn, N. Y., for appellant.

Martin Paul Solomon, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, New York City, and Irwin B. Robins, Asst. U. S. Atty., on the brief), for respondents.

Before WATERMAN and MOORE, Circuit Judges, and BONSAL, District Judge.*

MOORE, Circuit Judge:

Emilio Pizzarello (appellant) appeals from an order of the District Court for the Southern District of New York, 285 F.Supp. 147, entered in an action to enjoin the levy of a jeopardy assessment [1] for unpaid wagering taxes on money illegally seized by the United States (the Government). The order, entered on May 31, 1968, denied appellant's application for a preliminary injunction against the levy on $125,882 in currency, obtained by Special Treasury Agents, to satisfy a tax assessment of $282,440.70. It also denied his application pursuant to 28 U.S.C. §§ 2282 and 2284 for a three-judge court to hear his suit for a preliminary injunction and directed dismissal of his suit for a permanent injunction.

The tax assessment of $282,440.70 was personally approved by the District Director of the Internal Revenue Service following an unsuccessful criminal prosecution of Pizzarello for illegal wagering activity and an equally unsuccessful forfeiture proceeding brought against the $125,882.[2] The background of these suits is set out in greater detail below.

The record in the criminal prosecution indicates that Pizzarello, a proprietor of

---

* Of the Southern District of New York, sitting by designation.

1. Jeopardy assessments are authorized by 26 U.S.C. § 6862(a) if the District Director of Internal Revenue believes that the collection of a tax, other than income, estate or gift taxes, "will be jeopardized by delay." After a jeopardy assessment has been made and notice sent to the taxpayer, the tax becomes immediately due and payable.

2. The forfeiture proceeding was brought pursuant to 26 U.S.C. § 7302 to forfeit the funds used in violation of the provisions of the internal revenue laws.

a luncheonette in Mount Vernon, New York, was arrested on April 15, 1965, and charged with being in the business of illegally accepting wagers. He was searched incident to his arrest and ten horse bet slips, one pay and collect slip and $425 in currency were discovered, including marked currency given to him shortly before as a wager by an undercover agent.

Four hours after his arrest, Special Treasury Agents caused a wall safe in the back of the luncheonette to be opened and $123,017 in cash was discovered, along with insurance policies and a savings account book. Shortly thereafter, wedged between the metal top and a wooden leg of a table next to the safe, $2,440 and a large number of policy or betting slips were found. The total amount seized on April 15, 1965, therefore, amounted to $125,882.

In due course an information was filed alleging that Pizzarello had operated a gambling establishment illegally from March 30, 1965, to April 15, 1965, without registering with the District Director as required by 26 U.S.C. § 4412 and without paying the special occupation tax imposed by 26 U.S.C. § 4411. At about the same time, a libel of information was filed to forfeit the $125,882 [3] seized on his arrest.

At a suppression hearing prior to his trial, the warrant under which Pizzarello had been arrested was declared to be invalid for lack of probable cause.[4] 65 Cr. 729 (S.D.N.Y. Oct. 25, 1965). With it fell the search and seizure by which the agents had obtained the $123,017 and the $2,440 and bet slips wedged under the table top. However, the remaining $425 in currency, the ten horse bet slips and the one pay and collect slip taken from Pizzarello's person incident to his arrest, as well as evidence of wagering transactions amounting to $290 placed by Special Agents with him and other gambling activities viewed by them were not suppressed and were used against him at his trial.

Notwithstanding his assertions that compliance with the registration and occupation tax provisions would have violated his Fifth Amendment privilege, the information resulted in conviction, without wilful intent, which was affirmed by this Court on November 17, 1967. United States v. Pizzarello, 386 F.2d 177 (2d Cir. 1967). However, the affirmance was vacated by the Supreme Court on March 4, 1968, Stone v. United States, 390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035, and the case remanded in light of Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968).

*Marchetti* held that the registration and occupational tax provisions of the federal wagering tax laws could "not be employed to punish criminally those persons who have defended a failure to comply with their requirements with a proper assertion of the privilege against self-incrimination." *Id.* 390 U.S. at 42, 88 S.Ct. at 699. The rationale was that since gambling was an "area permeated with criminal statutes," both federal and state, the obligation to register with the District Director created a "real and appreciable" hazard of self-incrimination.

Similarly, *Grosso* held that an individual cannot be prosecuted for failure to pay the wagering excise tax because of the same self-incriminatory hazards. The Court also concluded that the "required records" doctrine, Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948), could not be "ap-

---

3. Pizzarello asserts that he is the true owner of part of the $125,882, and the "true and bona fide" bailee of the remainder. The portion of the money held by him "for safekeeping" belongs to a relative and two employees, who, he states, have "authorized [him] to claim the return of all the money seized."

4. However, Pizzarello's arrest was declared to be valid because the arresting officer, as a "private person," saw the appellant commit a misdemeanor in his presence. N.Y.Code of Criminal Procedure, § 183; United States v. Viale, 312 F.2d 595 (2d Cir. 1963). 65 Cr. 729 (S.D. N.Y. Oct. 25, 1965).

propriately applied to these circumstances," inasmuch as a gambler's records did not have "public aspects" which would render them at least analogous to public documents, and as the purpose of the United States' inquiry was financial, rather than "essentially regulatory." *Id.* 390 U.S. at 67, 68, 88 S.Ct. 709. The interest of the United States was assumed to be the collection of revenue and not the prosecution of gamblers. United States v. Calamaro, 354 U.S. 351, 358, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957).

Subsequent to the *Marchetti* and *Grosso* decisions and the reversal of his criminal conviction, Pizzarello sought summary judgment against the United States in the forfeiture action.[5] By a decision filed May 8, 1968, Judge Tyler held that the "money having been determined to be nonforfeitable, the government has no further legal claim to the entire sum of $125,882" and that "this sum must be turned over to claimant Pizzarello." 286 F.Supp. 643, 647 (S.D. N.Y.1968). However, before this decision, a "Statement of Tax Due," dated April 24, 1968, was sent to Pizzarello declaring a jeopardy assessment of $282,-440.70 for unpaid taxes. No indication was given that the assessment was, in fact, for unpaid wagering taxes; the claim was said to be based "on an audit of [his] tax return for the period shown," although none had been filed.

As a result of the intervening jeopardy assessment, no order has been entered in the forfeiture suit and, as a levy was imminent on the $125,882, Pizzarello sought a preliminary injunction to restrain the collection of the tax. Contending that the jeopardy assessment, coming as it did before the filing of the opinion in the forfeiture proceeding, amounted to a frustration since it relegated him to a suit for refund, he argues that to meet the required burdens in a refund suit, he would be forced to waive his Fifth Amendment privilege, or give

up the money. This alleged dilemma is said to permit the Government to achieve an indirect forfeiture under the guise of a jeopardy assessment, having failed to achieve forfeiture directly. Because the tax claim becomes a lien in favor of the Government upon all property and rights to property of the taxpayer on assessment, Pizzarello asserts he will be ruined unless this Court reverses the District Court's refusal to grant an injunction against the assessment and levy.

At the outset, the Government challenges the power of this Court to grant the relief the appellant requests. The Government asserts, and the District Court so held, that injunctive relief is barred by 26 U.S.C. § 7421(a), which, with exceptions not here relevant, provides:

> \* \* \* no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.

■ As both parties recognize, this provision has been construed by the Supreme Court in Enochs v. Williams Packing Co., 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962), where Chief Justice Warren, speaking for a unanimous Court [Mr. Justice Frankfurter not participating], stated that, notwithstanding this mandate, it was proper to enjoin an attempted tax collection where "it is clear that under no circumstances could the Government ultimately prevail" *and* where "equity jurisdiction otherwise exists." *Id.* at 7, 82 S.Ct. at 1129.

The reasoning is that, because both requirements must be satisfied before an injunction can issue, the central purpose of the act is inapplicable. *Enochs, supra* at 7, 82 S.Ct. 1125. That is to say, since a taxpayer must meet the "double burden," there would be no undue judicial

---

5. Inasmuch as a judgment of acquittal was subsequently entered in the criminal case, there was no violation of the internal revenue laws on which forfeiture of the funds could be predicated. See Note 2, supra. United States v. $125,882 In U. S. Currency, 286 F.Supp. 643, 646 (S.D.N.Y. 1968).

interference with the United States raising its lawful revenue.

Applying the *Enochs* exception to this case, the question of whether the Government has a chance of ultimately prevailing is to be determined "under the most liberal view of the law and the facts." *Enochs, supra* at 7, 82 S.Ct. at 1129. Thus, where it is apparent that the Government cannot establish its claim, only then does jurisdiction exist to enjoin the collection of the tax. In *Enochs*, liability for unpaid social security and unemployment taxes depended upon a resolution of the factual question as to whether an employee relationship existed between the owners of shrimp boats and their fishermen crews. The likelihood that the Government might prevail caused the Court to hold that "the Government's claim of liability was not without foundation." Therefore, judgment is to be made on the record before us as to whether the Government's claim of tax liability is without foundation. Since there are very few absolutes in the law, this judgment must be exercised in the light of the facts of this case in resolving the "under no circumstances" question, mindful, however, that the Supreme Court has stated, "To require more than good faith on the part of the Government would be to unduly interfere with a collateral objective of the Act—protection of the collector from litigation pending a suit for refund." *Enochs, supra* at 7, 8, 82 S.Ct. at 1129.

■ We begin with the assumption that a tax assessment is presumptively valid and that the burden is on the taxpayer to prove its invalidity. *Helvering v. Taylor*, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Commissioner of Internal Revenue v. Hansen*, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959). Such a presumption is not evidence itself and disappears upon the introduction of evidence to overcome it. *Compton v. United States*, 334 F.2d 212 (4th Cir. 1964); *New York Life Insurance Co. v. Gamer*, 303 U.S. 161, 58 S.Ct. 500, 82 L.Ed. 726 (1938); *Kentucky Trust Co. v. Glenn*, 217 F.2d 462 (6th Cir. 1954).

Pizzarello attacks the assessment of $282,440.70 in wagering taxes, first, as excessive and, then, as illegal, because allegedly based on unlawfully obtained evidence. In addition, he argues essentially that the wagering tax is unconstitutional on its face and as applied. For the reasons which will become evident, we find it unnecessary to deal with the constitutional contentions raised by the appellant.

■ Appellant's position that the assessment of $282,440.70 is totally excessive is founded upon the manner by which the Internal Revenue Service admittedly calculated the tax. The District Director's affidavit explained that "A revenue agent of the Internal Revenue Service computed the gross wagers for the period from April 1, 1960, to April 15, 1965, inclusive, exclusive of Sundays, by applying to the days of operation the average of wagers accepted for April 12th, 13th and 14th, 1962." By this method, the total amount of wagers allegedly received amounted to $2,824,407; 10% of which, or $282,440.70, was the tax said to be due.

One engaged in the business of accepting wagers is required by 26 U.S.C. §§ 4403 and 4423 to keep daily records of the gross wagers received and to produce them "as frequently as may be needful to the enforcement of this [tax]." Pizzarello produced no records and the Government was obliged to esitmate the volume and extent of his business. In so doing, as noted, it used a three-day average to calculate the wagers thought to have been received by the appellant over a five-year period.

But there is no proof in the record before us that Pizzarello operated as a gambler for five years or that, even if he did so operate, his three-day average of April 12th–14th, 1962, represented his average daily business for the other 1,575 days. No court could properly make such inferences without some foundation of fact.

The Government asserts, however, that the method chosen is proper, citing as authority O'Neill v. United States, 198 F.Supp. 367 (E.D.N.Y.1961). There the Government had the defendant's records for the entire month of February. Using a figure which was approximately 75% of the total February slips, the gross receipts were computed by multiplying this "modified" February figure by sixteen months, the time his indictment charged he had engaged in illegally accepting wagers. The District Court upheld the assessment, indicating that the Internal Revenue Agents did the best they could do under the circumstances at arriving at the proper figure. But there the Court had proof both of the duration and of at least a month's volume.

Assuming, but without deciding, that the calculation in the *O'Neill* case was proper, in the instant case the indictment charged Pizzarello with operating a bookmaking establishment only from March 30, 1965, until April 15, 1965. Where the Government got the date that Pizzarello was accepting wagers from April 1, 1960, is unsupported either by the record or by affidavits.[6] Moreover, while we recognize the difficulties faced by Treasury Agents and the need to estimate in situations of this nature, wagers received on three consecutive days can hardly be said to be representative of wagers received over a five-year period, even assuming Pizzarello accepted wagers for as long as the Government contends. Notwithstanding the Government's assertion that there is substantial evidence of an extensive gambling operation here, at his trial evidence of gambling activity was limited to a period of only slightly over two weeks.

The danger in compelling a taxpayer in a comparable situation to resort to a suit for refund is apparent. Serious and permanent injury may result before the legality of the tax can be determined. In

Rinieri v. Scanlon, 254 F.Supp. 469 (S.D. N.Y.1966), a jeopardy assessment of $247,820 was invalidated because the Court found that the tax, assessed without any substantiating evidence, was "arbitrary, capricious and unconscionable" and calculated so as to justify the seizure of $247,500 from plaintiff's person at Idlewild International Airport, New York. *Id.* at 474. Nearly four years elapsed before the tax claim was held to be wholly arbitrary. Here, Pizzarello has been deprived of his money since April 15, 1965. Because the District Director made a totally excessive assessment, excessive because based on entirely inadequate information, collection should be enjoined, if equity jurisdiction otherwise exists.

◼ Aside from excessiveness, Pizzarello contends that the assessment of $282,440.70 is invalid because assertedly computed on the basis of illegally seized evidence. Two issues are raised by this contention. The first is whether the computation was, in fact, based on unlawfully obtained evidence? The second is, assuming that it was, does that conclusion make the assessment uncollectible? Beginning with whether the assessment was made with evidence illegally seized, the trial court states that this is unclear. Citing the affidavit of the District Director explaining how the computation was made, the court said it appeared "that the assessment was based wholly or in large part" on evidence from Pizzarello's person, lawfully obtained. However, the District Director's affidavit explicitly states that an Internal Revenue Agent computed the tax due from the "records seized during a search of [Pizzarello's] premises * * * on April 15, 1965." Since the search was held illegal at the suppression hearing, it is apparent that the records used were illegally obtained.

This conclusion is supported independently *dehors* the District Director's af-

---

6. The Government asserts for the first time, in its Brief, that "The Internal Revenue Service was advised by the Yonkers Police that [Pizzarello's] luncheonette was being used to conduct a bookmaking business [from April 1, 1960] to April 14, 1965, inclusive."

fidavit. The only properly obtained records were the ten horse bet slips and the one pay and collect slip found in Pizzarello's possession when he was arrested. Since these are hardly sufficient for an accurate determination of the wagers received over a period in excess of five years, the assessment must have been based in substantial part, if not *in toto*, on unlawfully obtained evidence.

There remains the question of whether the fact that illegally seized evidence was used to compute the assessment renders the tax illegal. Widespread uncertainty is prevalent on the issue of whether evidence, inadmissible in a criminal case, can be used for other purposes, and the Supreme Court has yet to resolve the problem.

The closest case in point is the District Court case of Lassoff v. Gray, 207 F. Supp. 843 (W.D.Ky.1962), which involved a fact situation nearly identical to the instant appeal. The plaintiffs sought to restrain the collection of wagering taxes assessed on illegally obtained evidence. The suit was initially dismissed on jurisdictional grounds, but, notwithstanding the anti-injunction prohibition contained in Section 7421(a), the dismissal was reversed by the Sixth Circuit, which remanded with directions that a hearing be held on the legality of the assessments and the existence of extraordinary circumstances which would warrant equitable relief. 266 F.2d 745 (6th Cir. 1959). On the rehearing, the District Court concluded that since illegally seized evidence was used in calculating the assessment, the tax was invalid. However, in supplemental findings of fact and conclusions of law, rendered necessary by the intervening Supreme Court decision in *Enochs*, the Court reversed itself, stating that it could not conclude "under the most liberal view of the law and facts [existing] at the time these suits for injunction were filed, [that] it was clear the Government could not ultimately prevail." Its finding that the assessment was illegal, the Court stated, was "unnecessary for a decision." *Lassoff, supra* 207 F.Supp. at 851.

The District Court's initial conclusion that the illegally seized evidence could not be used to assess a wagering tax was based on a statement by Mr. Justice Holmes in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), where he declared, "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before this Court, but that it shall not be used at all." *Id.* at 392, 40 S.Ct. at 183.

The number of cases where the exclusionary rule has been applied is far greater than those where it has not. The Supreme Court has held that the rule applies in forfeiture cases because such proceedings are quasi-criminal. One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965). Additionally, lower federal courts have excluded illegally obtained evidence in deportation proceedings, Ex parte Jackson, 263 F. 110 (D.C.Mont. 1920), appeal dismissed, Andrews v. Jackson, 267 F. 1022 (9th Cir. 1920), in actions to recover duties on liquors imported into the United States, Rogers v. United States, 97 F.2d 691 (1st Cir. 1938), in tax assessment cases, Tovar v. Jarecki, 83 F.Supp. 47 (N.D.Ill.1948), [dictum], reversed on other grounds, 173 F.2d 449 (7th Cir. 1949), and in discharge proceedings against a civil employee. Powell v. Zuckert, 125 U.S.App. D.C. 55, 366 F.2d 634 (1966).

When private individuals procure evidence in violation of the law, they are subject to civil and criminal liability. The existence of such liability as a deterrent is significant. Because of the resultant availability of civil and criminal remedies, some states have held evidence obtained by illegal private searches and seizures, if probative, admissible in civil suits between private litigants. Sackler v. Sackler, 15 N.Y.2d 40, 255 N.Y.S.2d 83, 203 N.E.2d 481, 5 A.L.R.3d 664 (1964); Diener v. Mid-American Coaches, Inc., 378 S.W.2d 509 (Mo.1964). Contra, Williams v. Williams, 8 Ohio Misc. 156, 221 N.E.2d 622(1966).

This case, however, while civil in nature is not between private parties and there are no analogous independent deterrents to, or remedies against, government violations of the Fourth Amendment. The prohibition against unreasonable searches and seizures is directed at governmental action. Absent an exclusionary rule, the Government would be free to undertake unreasonable searches and seizures in all civil cases without the possibility of unfavorable consequences. In such a situation, while the matter has not been settled by Supreme Court decision, it seems clear, even under a view of the law most favorable to the Government, that evidence so obtained would be excluded. Because Pizzarello's tax assessment was based in substantial part, if not completely, on illegally procured evidence, the assessment is invalid.[7]

■ The conclusion is reached that the assessment of $282,440.70 in wagering taxes is also excessive, arbitrary, and without factual foundation. It would, therefore, appear that the Government cannot ultimately establish its claim and that the first requirement of the *Enochs* exception is satisfied. If Pizzarello can show the existence of extraordinary circumstances justifying the intervention of equity, collection of this assessment should be enjoined.

Pizzarello asserts that unless he is granted an injunction he "will suffer immediate and irreparable damage." In his affidavit in support of an injunction, he lists his sole occupation as "proprietor of my stationery store-luncheonette," which nets an income of approximately $8,000 per year. His assets allegedly consist of a house in his wife's name, purchased for $25,000 with a mortgage of $9,312.58, and another house in the joint names of appellant and his mother. He contends that "she is the true owner" and "my name is used for the sake of convenience." He also has a bank account containing $1,292.21 and a 1958 Cadillac which he recently purchased "in bad condition for $150." His son and daughter have cars which they purchased.

His liabilities, as specified in his affidavit, aside from the mortgage, include fuel bills of $1,471.98 for his home and "those relatives who are my responsibility," unpaid medical bills of $3,130, $12 a week for his mother's care at a nursing home and $221 a month for special schooling for his son "because of a disability."

A tax claim becomes a lien in favor of the Government on all property of the taxpayer upon assessment, 26 U.S.C. §§ 6321 and 6862. The assessment of $282,440.70 is, therefore, a lien on all of Pizzarello's assets, which would certainly seem to be insufficient to cover the tax.

The District Court, however, concluded that this "is of no moment because the 'full payment' principle in respect of income taxes * * * does not appear to be applicable to excise taxes which 'may be divisible into a tax on each transaction or event, so that the full-payment rule would probably require no more than payment of a small amount.'" Flora v. United States, 362 U.S. 145, 175 n. 38, 80 S.Ct. 630, 4 L.Ed.2d 623 (1962). In short, the Court concluded that Pizzarello would not suffer irreparable harm because his remedy at law was adequate. That is to say, he could pay the tax on one transaction and thereafter institute a suit for refund.

Appellant argues, nonetheless, that this legal remedy is inadequate because compliance with the burdens imposed on a taxpayer seeking a refund would open him to substantial hazards of self-incrimination. He states he would no more be able to realistically recover his money in a suit for refund on a single wagering transaction than he would for

---

7. Despite the obligation imposed by 26 U.S.C. §§ 4403 and 4423 to make records available "as frequently as may be needful to the enforcement of this [tax]," appellant's records of wagering activity could not be subpoenaed under the "public records" doctrine of Shapiro v. United States, *supra*. Grosso, *supra*, 390 U.S. at 67, 68, 88 S.Ct. 709.

a refund if he had paid the entire amount, without making himself vulnerable to state or federal prosecution for illegal gambling activity. He contends that in such a suit he has the burden not only of proving the assessment invalid, but also of proving the amount, if any, to which the Government is properly entitled. To meet the second burden, he asserts that he would have to testify to his gambling activities, thereby exposing himself to prosecution in New York. His sole alternative allegedly would be to forfeit the $125,882.

The situation facing Pizzarello is not too dissimilar from that presented to the Seventh Circuit in United States v. United States Coin and Currency in the Amount of $8,674.00, 393 F.2d 499 (7th Cir. 1968), where the court said:

"The prospect of a felony conviction involved in *Marchetti* of course has a greater coercive effect than the possible loss of money involved herein. On the other hand, the prospect of losing in excess of $8,000 has a substantial coercive effect. In this respect, the landmark case of Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, is controlling. *Boyd* was a civil forfeiture action in which the claimant was given a choice between producing a possibly incriminating document and forfeiting the property. The Court held that such a choice was impermissible under the Fourth and Fifth Amendments. See Garrity v. State of New Jersey, 385 U.S. 493, 496–497, 87 S.Ct. 616, 17 L.Ed.2d 562, which reaffirms and follows *Boyd*." *Id.* at 500.

The financial burden imposed by levying against his personal and business property may, in fact, result in irreparable injury. An allegation of irreparable injury to a taxpayer through forced sale of his business, if proven, has been held to be grounds for equitable relief. Midwest Haulers v. Brady, 128 F.2d 496 (6th Cir. 1942). However no hearing has been held below on what economic damage Pizzarello may suffer if collection is not enjoined. Although it appears on the record before us that he is likely to suffer serious hardship, we feel it wiser to remand for a complete hearing where the facts can be more fully disclosed.

We understand that the amount seized on April 15, 1965 is currently lodged in the Office of the United States Marshal for the Southern District of New York. It is ordered that this sum remain in his custody pending the entry of final judgment herein and pending any and all appeals therefrom.

For the reasons indicated, the order denying an injunction and directing dismissal is reversed. The case is remanded to the District Court for further proceedings not inconsistent with this opinion. The order denying the appointment of a three-judge court is affirmed.