Archie Dale CARSON,
Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 75–3262.

United States Court of Appeals,
Fifth Circuit.

Oct. 11, 1977.

**694**

James F. Gaulding, Dallas, Tex., for plaintiff-appellant.

Frank D. McCown, U. S. Atty., William L. Johnson, Jr., Asst. U. S. Atty., Fort Worth, Tex., Scott P. Crampton, Robert E. Lindsay, Robert T. Duffy, Asst. Attys. Gen., Tax Div., U. S. Dept. of Justice, Gilbert E. Andrews, Act. Chief, Appellate Sec., U. S. Dept. of Justice, Myron C. Baum, Acting Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before TUTTLE, GOLDBERG and CLARK, Circuit Judges.

GOLDBERG, Circuit Judge:

Archie Dale Carson (taxpayer) appeals from the district court's rejection of his challenge to two excise tax assessments based on his alleged wagering activities during the fall and winter months of 1970–71 and 1971–72. He contends that those assessments, based on projections from his records of the bets he accepted during one week in January 1972, are arbitrary and excessive.

Disposing of this appeal requires examination of taxpayer's burden of proof and the significance of his destroying most of his wagering records other than those on which the government projections are based. These factors notwithstanding, we must conclude that the court below erred in sustaining the assessment for August 1970–January 1971. The record is utterly devoid of evidence that taxpayer was then engaged in the business of accepting wagers, as the government in effect concedes by relying solely on the presumption of correctness generally afforded its tax assessments. With taxpayer's testimony excluded, moreover, what evidence is in the record suggests if anything that appellant began to accept wagers in the fall of 1971. In these circumstances the district court's finding that taxpayer was in the business of accepting wagers during August 1970–January 1971 was clearly erroneous, and the portion of the judgment based on the 1970–1971 assessment must be reversed.

On the other hand, we readily affirm the court's judgment regarding the 1971–72 assessment. The district court could find that appellant was then engaged in accepting bets. The projection method as employed here was not unreasonable, and the court could properly reject appellant's challenges to it, which rested largely on his own testimony.

I. Facts

On January 15, 1972, local law enforcement officers searched a duplex rented by taxpayer and seized betting slips and other documents he had used to record wagers. The officers later turned the records over to the Internal Revenue Service.

Working solely from those records, IRS agents made the excise tax assessments at issue here. They did so by projecting over each week of the periods assessed the volume of bookmaking activity that occurred during the week of the search. In February 1972, the IRS assessed wagering excise taxes and interest, I.R.C. § 4401, for the period August 1971–January 1972 in the principal amount of $82,652.80. An assessment for the wagering occupational excise tax, I.R.C. § 4411, was also levied at this time for an eleven month period between August 1971 and June 1972, in the principal amount of $45.83.

Two years later, in May 1974, IRS assessed wagering excise taxes and interest for the months August 1970 through December 1970. In August 1974 an assessment for January 1971 was added. The total principal amount of the assessment

for the 1970–71 period was $83,850.67. At this time the IRS assessed another eleven month occupational tax in the principal amount of $45.83.

Taxpayer paid the $45.83 occupational tax for 1971–72 and brought this refund suit in district court. The government counterclaimed for the remainder of the assessments.

With taxpayer's testimony favorable to himself excluded, the following facts emerged at the bench trial below. Carson operated a bookmaking establishment during the fall and winter months of 1971–72. Toward that end, in August or September 1971 he rented the duplex from which the wagering records would later be seized. In October 1971 he had additional telephone service installed in the duplex to facilitate his gambling operation. Also in October he borrowed $15,000 for use in accepting bets on football games. During the week ending on January 15, 1972, the date of the search, appellant accepted wagers of $35,-936, divided into $18,536 on football and $17,400 on basketball.

In contrast to the light it sheds on the 1971–72 season, the record reveals absolutely nothing linking taxpayer to any gambling business during the same months of 1970–71. Prior to May 1971 appellant operated Dale's Blue Lounge Club in Wichita Falls. The government introduced one entry from a seized notebook that read "5/22—Bill Heath—$10.00." Taxpayer testified that this entry, admittedly for 1969, was a loan. While contending the entry reflected a bet, the government did not attempt to show whether the bet was placed by taxpayer or accepted by him. In any case the government recognized that the single $10 1969 entry could not form the basis for any inference of a 1970–71 gambling operation of the nature reflected in the assessment.

The only other pre-1971 evidence is contained in a 1973 preliminary report attached to the 1974 assessment of taxes for the 1970–71 season. That report contains the statement of an IRS agent that an examination of the seized records "revealed that taxpayer received wagers in both August and November of 1970." The nature of the underlying evidence is not otherwise discussed in the report, and none of the records introduced below contain any evidence of such 1970 activity.

Relying on the presumption of correctness and what he regarded as taxpayer's failure to introduce evidence sufficient to overcome the presumption, the district judge upheld both assessments. Accordingly, he dismissed taxpayer's refund claim and granted a judgment in favor of the government for the full amount of its counterclaim.

II. The Absence of Records and the Taxpayer's Burden of Proof: A Framework

▮ We may best begin by recalling observations to which both taxpayer and tax collector here might have paid better heed:

[W]e recognize that the absence of adequate tax records does not give the Commissioner carte blanche for imposing Draconian absolutes. . . . [However,] such absence does weaken any critique of the Commissioner's methodology.

Arithmetic precision was originally and exclusively in [the taxpayer's] hands, and he had a statutory duty to provide it. . . . Having defaulted in his duty, he cannot frustrate the Commissioner's reasonable attempts by compelling investigation and recomputation under every means of income determination. Nor should he be overly chagrined at the [district court's] reluctance to credit every word of his negative wails.

*Webb v. Commissioner of Internal Revenue,* 394 F.2d 366, 373 (5th Cir. 1968).

▮ Alongside the significance of the absence of records and the limits of that significance, we must consider the burden of proof that lay with taxpayer below and the presumption of correctness that attends the Commissioner's assessments. The burden and the presumption, which are for the most part but the opposite sides of a single coin, combine to require the taxpayer al-

ways to prove by a preponderance of the evidence that the Commissioner's determination was erroneous. *See United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976); *Bar L Ranch, Inc. v. Phinney*, 426 F.2d 995 (5th Cir. 1970); *Higginbotham v. United States*, 556 F.2d 1173, No. 75–1487 (4th Cir. 1977). This burden applies whether the proceeding is in Tax Court for redetermination of a deficiency or in district court upon a refund claim or a government counterclaim. *See Bar L Ranch, Inc., supra*, 426 F.2d at 998.

▆▆▆ In a Tax Court deficiency proceeding, once the taxpayer has established that the assessment is erroneous, the burden shifts to the government to prove the correct amount of any taxes owed. In a refund suit, on the other hand, the taxpayer bears the burden of proving both the excessiveness of the assessment and the correct amount of any refund to which he is entitled. *See Janis, supra*, 96 S.Ct. at 3025; *Bar L Ranch, Inc., supra*, 426 F.2d at 998.

▆▆▆ This court has held that, as in Tax Court deficiency proceedings, when the government attempts to collect a tax by way of a counterclaim in district court the taxpayer bears only the burden of proving the assessment erroneous. *See Bar L Ranch, Inc., supra*, 426 F.2d at 998. The Supreme Court has recently noted, but did not attempt to resolve, a split in the circuits over whether in such a situation the taxpayer ought not also have to prove the correct amount of any taxes owing. *See Janis, supra*, 96 S.Ct. at 3026.

▆▆▆ While we find nothing in *Janis* that casts doubt on the continuing validity of *Bar L Ranch*, reliance on the latter decision is unnecessary to decision of the case at bar. As regards the taxpayer's activities during the fall and winter of 1970–71, the government's assessment falls within a narrow but important category noted in *Janis* of "'naked' assessment without any foundation whatsoever, . . . not properly subject to the usual rule with respect to the burden of proof in tax cases." 96 S.Ct. at 3026. More specifically, the presumption of

correctness notwithstanding, a wagering excise tax assessment cannot stand without some evidence tending to support an inference that the taxpayer engaged in gambling activities during the period assessed. *See Gerardo v. Commissioner of Internal Revenue*, 552 F.2d 549 (3d Cir. 1977); *Pizzarello v. United States*, 408 F.2d 579 (2d Cir. 1969).

The assessment for 1970–71 lacked that necessary foundation. On the other hand, the district court could properly conclude that the taxpayer had failed to satisfy his burden of proving the 1971–72 assessment erroneous.

### III. The Assessment for 1970–71

The jurisprudence finds justification for the presumption that assessments are correct and for the taxpayer's burden of proof in the strong need of the government to accomplish swift collection of revenues and in order to encourage recordkeeping by taxpayers. *See Bull v. United States*, 295 U.S. 247, 259–60, 55 S.Ct. 695, 79 L.Ed. 1421 (1935); *Higginbotham v. United States*, 556 F.2d 1173, No. 75–1487 (4th Cir. 1977). The clandestine nature of gambling operations in most states and the frequent failure of bookmakers to keep records require applying the presumption of correctness to the Commissioner's reconstruction of the tax base by any reasonable method where adequate records have not been kept. *See United States v. Firtel*, 446 F.2d 1005 (5th Cir. 1971).

Neither tax collection in general nor wagering activities in particular, however, have ever been thought wholly to excuse the government from providing some factual foundation for its assessments. The tax collector's presumption of correctness has a herculean muscularity of Goliathlike reach, but we strike an Achilles' heel when we find no muscles, no tendons, no ligaments of fact.

The Third Circuit has recently faced a case very similar in fact to the case at bar, and the court articulated a restraint on the Commissioner's powers of assessment that we find properly condemns the 1970–71 determination before us:

[I]n order to give effect to the presumption on which the Commissioner relies, some evidence must appear which would support an inference of the taxpayer's involvement in gambling activity during the period covered by the assessment. Without that evidentiary foundation, minimal though it may be, an assessment may not be supported even where the taxpayer is silent.

While we realize the difficulties the Commissioner encounters in assessing deficiencies in circumstances such as are presented here, we nevertheless must insist that the Commissioner provide some predicate evidence connecting the taxpayer to the charged activity if effect is to be given his presumption of correctness.

*Gerardo v. Commissioner of Internal Revenue,* 552 F.2d 549, 554 (3rd Cir. 1977) (citation omitted).

In *Gerardo,* the IRS had conducted an investigation of a lottery operation between August 5, 1966 and February 3, 1967, which provided ample evidence that the taxpayer acted as a principal in the operation throughout that time. The Commissioner assessed taxes against Gerardo by projecting the average daily receipts from 2 days in February 1967 back past August 5 to April 4, 1966. The only evidence linking the taxpayer to a gambling operation prior to August 5 when IRS surveillance began was an April 4 raid of a different location that produced betting slips corresponding to those seized from the operation in which

the taxpayer had been observed. The court concluded, under the language quoted above, that the slips could not support an inference linking the taxpayer to pre-August 5 gambling activities, and it reversed the Tax Court's judgment insofar as it sustained the taxes assessed for the period prior to that date.

The *Gerardo* court found support for its approach in *Pizzarello v. United States,* 408 F.2d 579 (2d Cir. 1969). In *Pizzarello,* the taxpayer had been criminally charged with operating a bookmaking establishment from March 30, 1965 through April 15, 1965. Based on the average take from three days within that period the Commissioner assessed taxes for a five-year period from April 1, 1960 through April 15, 1965. The taxpayer had produced nothing to contradict the assessment. Despite evidence of a substantial gambling operation in business during the first two weeks of April 1965, the Second Circuit concluded that the assessment was without factual predicate:

[But] There is no proof in the record before us that Pizzarello operated as a gambler for five years . . .. No court could properly make such inferences without some foundation of fact.

408 F.2d at 583.[1]

■ Under the guidelines set forth in *Gerardo* and *Pizzarello,* the assessment in the case at bar for August 1970–January 1971 must stand condemned. The record is utterly lacking in evidence that would support an inference the taxpayer operated a gambling business during those months. A

---

1. *Pizzarello* was a suit to enjoin the levy of a jeopardy assessment. Thus the court was not concerned with the question whether the record was inadequate to justify enforcing the assessment, but with whether the circumstances satisfied the requirements, even more extreme from the taxpayer's point of view, for avoiding the reach of the Anti-Injunction Act, I.R.C. § 7421(a).

The government has contended here that *Pizzarello* has been read restrictively in the Second Circuit. The case proffered in support of this assertion disproves it. *See Hamilton v. United States,* 309 F.Supp. 468 (S.D.N.Y.1969), aff'd 429 F.2d 427 (2d Cir. 1970), *cert. denied,* 401 U.S. 913, 91 S.Ct. 881, 27 L.Ed.2d 812 (1971). The district court in *Hamilton* did look

more approvingly on the projection method employed there than had the Second Circuit in *Pizzarello,* but found that one critical factor in *Pizzarello*'s holding was the absence of proof that the taxpayer had accepted wagers over the full period assessed. Whatever criticisms might have been levelled at the projection method, the district court in *Hamilton* affirmed the assessment because the taxpayer admitted having been in the business during the four years assessed. The factor missing in *Pizzarello* was present in *Hamilton,* and the Second Circuit affirmed based on the district court opinion "which pointed out important factual distinctions from *Pizzarello.*" 429 F.2d at 427. The law of the Second Circuit thus continues to support the approach we take today.

single $10 notebook entry for May 1969 will not do. Nor without elaboration will the cryptic statement in the agent's 1973 report that a review of the records seized from appellant "revealed that taxpayer received wagers in both August and November of 1970." Such an unsupported and unexplained conclusion proves nothing, particularly where none of the records or other evidence introduced at trial by the government and the taxpayer support such a revelation of wagering activities.

The government does not seriously contend otherwise. Rather it takes the following bald, if not bold, position: "With respect to [the 1970–71] assessments, then, the Government relies entirely on the presumption of correctness." (Govt. Br. at 23). Such a position, which would support the most arbitrary of assessments so long as the taxpayer found himself unable to prove a negative, frequently difficult in quite innocent circumstances, does not become the government's agents, and we readily reject it.

We work no change in the burden or order of proof in wagering excise tax cases. We simply recognize that, at the close of all the evidence, if the record contains no item of proof tending to show that the taxpayer was engaged in wagering activity during the period assessed, the Commissioner's determination cannot prevail. The record before us contains no such predicate. If anything, the evidence below tended to suggest that taxpayer began large scale gambling operations only in the fall of 1971. At that time he rented the premises that eventually were raided, brought increased phone service to the premises, and took out a $15,000 loan.

Totally without factual foundation, the 1970–71 assessment cannot rest on the presumption of correctness. The district court apparently relied on the presumption, but in any event its finding that the taxpayer was in the business of accepting wagers from August 1970 through January 1971 is clearly erroneous. The judgment below must be reversed insofar as it reflects the assessments for those months.[2]

IV. The 1971–72 Assessment

■ By way of contrast, the assessment for August 1971–January 1972 is more than amply supported by the record. Taxpayer's four challenges, which rest largely on the district court's failure to credit his own testimony, all leave the assessment well intact.

A.

First, the taxpayer maintains that the record compels the conclusion that he began to accept wagers only in November 1971. He testified to that effect, and he produced what he claimed were photostatic copies of weekly summaries of the amounts of wagers he accepted in November and December, summaries he purportedly drew from records he admitted he had destroyed.

The evidence also shows, however, that in August or September 1971 the taxpayer rented the duplex where the records were seized. He obtained extra phone service in October, when he also procured a $15,000 loan. In light of these facts and the fact that the professional football exhibition season commences in August, the government's projection of wagering activities back through August 1971 was not unreasonable. Given as contrary evidence only the taxpayer's self-serving testimony and the "summaries", of little more inherent reliability than taxpayer's testimony, the district court's finding that taxpayer was in the business of accepting wagers from Au-

2. The result we reach works no departure from previous pronouncements of this court. In *Lucia v. United States*, 474 F.2d 565 (5th Cir. 1973) (en banc), this court recognized the validity of *Pizzarello* and joined its conclusion that an assessment utterly without factual founda-

tion cannot stand. The en banc court concluded that prior Fifth Circuit cases were consistent with *Pizzarello* and made clear that that case was to be followed. 474 F.2d at 573–75 (Roney, J., majority opinion); *id.* at 579 (Simpson, J., concurring in part and dissenting in part).

gust 1971 through January 1972 was not clearly erroneous.[3]

### B.

Taxpayer also testified that there is a general understanding between bettors and bookmakers that if a bookmaker is raided prior to the event on which a wager is based, the bet is cancelled. Taxpayer maintained that he had a specific understanding to this effect with his bettors. Under taxpayer's contention, nearly $17,000 of the $35,000 in bets accepted during the week ending with the raid January 15, the week that formed the basis for the projections, were cancelled bets not properly subject to the excise tax. This claim rested solely on the testimony of the taxpayer. The district court as trier of fact could properly choose to disbelieve him.

### C.

The taxpayer attacks the $36,000 base figure for a week's wagers in another way. He testified that $14,000 of those bets were not placed with him, but were bets he placed for third persons with other bookies. In support of this contention he introduced some of the betting slips originally seized by the government. He claimed that all those slips marked "00" were placed with other bookies.

In *Heyman v. United States,* 497 F.2d 121 (5th Cir. 1974), a taxpayer had attempted to discredit a wagering excise tax assessment with precisely the same story. He offered only oral testimony in support of his story. This court found that evidence insufficient to carry his burden of demonstrating the incorrectness of the assessment and affirmed a directed verdict in the government's favor.

The case at bar is not significantly different. While the taxpayer here supplemented his testimony with the betting slips marked "00", any inference that those slips represented bets placed with other persons would still rest solely on his testimony. Nothing other than the cryptic "00" distinguishes those slips from others which taxpayer admits represented bets placed with

him. With the taxpayer's contention in this regard reduced to the power of his oral testimony, the claim fails under *Heyman.*

### D.

The taxpayer offers a final attack on the assessment. The January records used as a base showed the approximately $36,000 wagers divided between $18,500 in football bets and $17,500 in basketball bets. In projecting these figures back through August, the IRS agents maintained the same ratio between basketball and football. The taxpayer sounds the obvious objection that basketball season does not begin in August and contends that the basketball figures should not have been projected beyond the beginning of basketball season, which he places at the beginning of December.

Why the agents chose to extend the bifurcation between basketball and football back into August is indeed perplexing. It is not enough, however, for the taxpayer to make an argument embarrassing to the IRS. As we stated in *Bernstein v. Commissioner of Internal Revenue,* 267 F.2d 879, 881 (5th Cir. 1959):

It is immaterial whether the Commissioner proceeded upon a wrong theory in determining the deficiency, and the taxpayer has the burden of showing that the assessment is wrong on any proper theory.

We may take notice of the fact that Texans have long regarded basketball, like weightlifting and education, primarily as something with which to entertain football players during the off-season, certainly not as a legitimate object of attention while titans battle on the gridiron. Nevertheless, a proper theory does support the government's assessment. The $36,000 of wagers reflected in the week's records seized in January may be viewed as a whole, a week's bets divided quite naturally in January almost evenly between football and basketball. That volume of betting could well have remained constant throughout the assessed period, though at the beginning the

---

**3.** There is no indication that either the October loan or the procurement of additional phone service that month were prerequisites to conducting the volume of business projected back through August.

bets would have been predominantly on football games. Having destroyed the daily records he was required by statute to keep, the taxpayer produced no evidence compelling a conclusion that a projection of this volume of betting throughout the period was excessive. Accordingly, we reject his final attack on the 1971–72 assessment.

## CONCLUSION

The portion of the judgment of the district court regarding the 1971–72 wagering excise taxes and wagering occupational excise tax is AFFIRMED. The portion of the judgment regarding the same 1970–71 taxes is REVERSED AND REMANDED for further proceedings consistent with this opinion.