Manuel J. XENAKIS, Plaintiff,

v.

The UNITED STATES of America, DEPARTMENT OF TREASURY, the INTERNAL REVENUE SERVICE, Defendant.

No. CIV.A.01–914.
Bankruptcy No. 00–20773.
Adversary No. 00–2262.

United States District Court,
W.D. Pennsylvania.

Nov. 16, 2001.

Donald R Calaiaro, Calaiaro & Corbett, PC, Pittsburgh, PA, for Plaintiff.

Frank A Falvo, I.R.S. Dist. Counsel, Pittsburgh, PA, for Defendant.

## *OPINION* and *ORDER OF COURT*

AMBROSE, District Judge.

Manuel J. Xenakis appeals from an order of March 28, 2001, by U.S. Bankruptcy Judge Bernard Markovitz, finding that unpaid excise taxes in the amount of $371,065.00, imposed for accepting illegal wagers, and for pre-petition interest accrued thereon in the amount of $236,235.75 are not dischargeable in bankruptcy. For the reasons set forth in the Opinion which follows, the Order of the Bankruptcy Judge is reversed and the matter remanded for further consideration.

## I. *FACTUAL AND PROCEDURAL HISTORY*[1]

In December 1989, Appellant Manuel J. Xenakis, a resident of Pittsburgh, Pennsylvania, agreed to help a childhood friend, Jerry Sabatini, in his business venture—an illegal numbers enterprise based in Cleveland, Ohio. Occasionally, Sabatini took more bets on the Ohio State lottery than he felt he could comfortably afford if the number on which his customers were betting paid off. (Bankruptcy Record, Trial Transcript, "T.T.," Item No. 35, at 6–7.)

Mr. Xenakis agreed that he would help by "laying off" those bets, i.e., finding other bookmakers in the Pittsburgh area who would cover them.[2] Generally, the amount laid off through Mr. Xenakis was "a couple of hundred dollars a day," three or four days a week. (T.T. at 9.) In exchange for this service, Sabatini paid Mr. Xenakis $250 for each week in which he provided such assistance, regardless of the amount of the bets placed through him. Mr. Xenakis reported this amount as "miscellaneous income" on his Form 1040 federal income tax returns for 1989 through 1991. Mr. Xenakis also wrote his own numbers for an additional $200 each week. (T.T. at 17–18.) This income was apparently not reported and he did not file the required "Form 730."[3]

The Internal Revenue Service ("IRS") began surveillance on Sabatini and soon discovered the Pittsburgh connection. Mr. Xenakis admitted his part in the numbers racket and served 16 months in a federal prison in West Virginia, then two months in a half-way house. (T.T. at 10.) When he was released from prison in 1995, the IRS informed him that he owed wagering excise tax arising from his involvement with Sabatini and demanded that he submit a Form 730 for each month in which he accepted wagers. Mr. Xenakis refused, claiming that he had merely been a mid-

---

1. Unless otherwise noted, the facts in this section are taken from the Memorandum Opinion of Judge Markovitz, *Xenakis v. United States,* 262 B.R. 339 (Bankr.W.D.Pa.2001).

2. "Laying off" is the practice whereby a bookmaker has more money bet on an event than he desires and he transfers or "hedges" all or part of the bet to another bookmaker. A bookmaker attempts to equalize the value of the bets parties have placed on each side of the event and insure his profit based on the "vigorish" or "juice," i.e., the commission paid by the better to the bookie over and

above the amount bet. The bookmaker's risk of loss decreases as the number of bets both for and against a particular outcome are equalized. In an attempt to "balance the book," bookmakers confer with one another and shift or "lay off" bets. *Fugate v. United States,* No. 89–5884, 1990 WL 113565, *3, n. 3, 1990 U.S.App. LEXIS 13702, *7, n. 3 (6th Cir. Aug. 8, 1990).

3. See Section III.A for a discussion of federal tax on gambling receipts and the required tax forms related thereto.

dleman who transferred all the income from the laid-off bets to Sabatini. (T.T. at 11.)

In August 1995, the IRS issued assessments for unpaid wagering taxes for the twenty-month period Mr. Xenakis was allegedly involved with Sabatini. The total amount was $700,066.25, including $371,065.00 for unpaid taxes, $236,235.75 for accrued interest and $92,765.50 for penalties.

Appellant filed for voluntary bankruptcy under 11 U.S.C. § 701 *et seq.* on February 4, 2000. His claimed assets totaled $58,275.11, almost all of which was the value of a house owned jointly with his former wife. His reported debts totaled $993,249.33, which included $873,455.77 owed to the IRS for "form 730 gambling taxes" incurred between 1989 and 1991. On March 27, 2000, the Chapter 7 trustee reported that this was a "no-asset" case.[4] (Brief for Appellee, "IRS Brief," Docket No. 6, at 2.) Consequently, the IRS did not file a proof of claim for the unpaid taxes, interest and penalty. (*Id.* at 2, n. 1.)

Mr. Xenakis filed suit against the IRS in Bankruptcy Court in the Western District of Pennsylvania on June 22, 2000. In Count I of his Amended Complaint, Appellant sought a determination that (1) his Federal individual income tax activities (Form 1040) for 1990 through 1994, inclusive,[5] and (2) the tax on wagering activities (Form 730) from December 1989 through July 1991 (including principal, interest and penalties) were both dischargeable under § 523(a)(7) of the Bankruptcy Code. (Bankruptcy Record, Item No. 7.) Count II objected to the claim of the IRS as inaccurate and demanded that the IRS prove its claim that he was liable for the wagering excise taxes.

Some time after the assessments were determined in August 1995, the IRS apparently lost the file containing the information on which the assessments were based. Mr. Xenakis averred in a motion to impose sanctions dated January 19, 2001, that he had formally requested the IRS to produce its file to substantiate the debt and to corroborate his claim that he had filed tax returns more than three years prior to declaring bankruptcy. (Bankruptcy Record, Item No. 11.) When that request—and follow-up requests— were unsuccessful, Appellant's counsel served the IRS with a Request for Production on January 2, 2001; the IRS again failed to respond. (*Id.*) Mr. Xenakis claimed that the IRS failure to produce these records damaged his case in that he would have little time, if any, to locate and produce evidence contrary to any information in the IRS file and would have no opportunity to depose anyone identified in the file who provided information to support the IRS claims. He requested sanctions in the form of an order from the Bankruptcy Court prohibiting the IRS from entering into evidence any alleged assessment, evidence with regard to the amount due, and evidence to dispute his contention that he had filed Form 1040

---

4. Notice of no dividend. In a chapter 7 liquidation case, if it appears from the schedules that there are no assets from which a dividend can be paid, the notice of the meeting of creditors may include a statement to that effect; that it is unnecessary to file claims; and that if sufficient assets become available for the payment of a dividend, further notice will be given for the filing of claims. 11 U.S.C., Bankr.Rule 2002(e).

5. The IRS later stipulated that Mr. Xenakis filed his income tax returns for 1990 through 1994 more than three years prior to February 4, 2000, and that the Form 1040 liabilities were therefore dischargeable. Those taxes are not at issue in this appeal. (IRS Brief at 2, n. 2.; Bankruptcy Record, Item No. 17, Parties' Pretrial Statement/Stipulation, at VI.)

income tax returns more than three years prior to the initiation of the bankruptcy. (*Id.*).

After an expedited hearing on the motion held on January 30, 2001, the Bankruptcy Court[6] ordered that because the IRS was unable to produce its file on Mr. Xenakis, "the Internal Revenue Service is prohibited from entering into evidence, at trial, any material from that file(s)." However, the court simultaneously ruled that "this Order is without prejudice to the Plaintiff's request that the Internal Revenue Service be prohibited from entering its assessment(s) into evidence at trial. That issue will be decided by the Trial Judge." (Bankruptcy Record, Item No. 16.)

At a trial held on February 7, 2001, both parties offered evidence on the issues in the case. Mr. Xenakis testified that he did not receive a percentage of the bets laid off through him but only a flat payment of $250 each week. (T.T. 11.) He also testified that when the numbers he played for Sabatini won, he would deliver the winnings to him either directly or through Sabatini's brother. (*Id.*) The IRS offered only a single witness, a bankruptcy specialist named Janet Pickering. (T.T. at 26 *et seq.*) As part of her job responsibilities, she was assigned the task of responding to the complaint filed by Mr. Xenakis seeking discharge of the wagering excise tax. In order to compile the necessary facts for that response, she requested some 20 pages of computer records detailing Mr. Xenakis' tax liability, described as "the literal transcripts."[7] (T.T. at 27–29.) Ms. Pickering testified that she did not prepare the information in the literal transcripts (T.T. at 39) and, on cross-examination, admitted she did not have any way of knowing if there were clerical or arithmetic errors in the calculation of the assessments or data entry errors in the process of recording them in the computer; had no records in court to substantiate the assessment; and had no personal knowledge of how it was made. (T.T. at 50–51.) She also testified that from the literal transcript, there was no way of knowing the extent of the assessment (i.e., whether it was based only on activities in Pittsburgh or in many states) or who did the assessment. (*Id.*) She also testified that although she tried to secure the files from the Cincinnati Office of the IRS "on several different occasions," she had not been able to receive them. (T.T. at 51.) Judge Markovitz specifically asked, "Do you know of any basis to conclude that this debtor was ... engaged in gambling having a total gross of approximately a million dollars a month?" to which Ms. Pickering responded, "No, I do not." (T.T. at 53.) The IRS did not present any records to support the assessment either at trial or with its post-trial brief. (Bankruptcy Record, Item 21.)

Over Appellant's objections at trial, the Bankruptcy Judge accepted the assessment of liability prepared by the IRS. (T.T. at 29–30.) After both parties submitted post-trial briefs on the issues, Judge Markovitz handed down his decision on March 29, 2001. *Xenakis v. United States*, 262 B.R. 339 (Bankr.W.D.Pa.2001). As to Count I, he found that under 11 U.S.C. § 523(a)(1)(B)(i), the wagering excise tax and the interest thereon were not dischargeable because Mr. Xenakis was required to file Form 730 tax returns on a monthly basis and failed to do so. However, the penalty on the unpaid assessment

---

6. This order was issued by Judge M. Bruce McCullough who presided at the hearing at the request of Judge Markovitz. (T.T. at 3.)

7. The witness later explained that "literal transcripts" translate IRS computer codes into English. (T.T. at 38.)

was dischargeable under § 523(a)(7)(B) inasmuch as it was imposed on unpaid taxes for a period more than three years prior to filing for bankruptcy. *Xenakis,* 262 B.R. at 345–346. As to Count II, Judge Markovitz agreed with the IRS that because it had filed no proof of claim against Mr. Xenakis, the demand that the IRS prove the amount of its claim was simply an improper attempt by the Appellant to shift the burden of proof as to his liability from himself to the government. *Id.* at 346.

Plaintiff appealed Judge Markovitz' decision on May 23, 2001. A proper bankruptcy record was compiled and the parties filed briefs in support of their respective positions. (Appellant's Brief by Manuel J. Xenakis, Docket No. 5, "Xenakis· Brief.")

## II. *JURISDICTION AND STANDARD OF REVIEW*

This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a)(1) and 11 U.S.C. Bankr.Rule 8001, as an appeal from a final order of a Bankruptcy Court Judge in the United States Bankruptcy Court for the Western District of Pennsylvania. A district court may affirm, modify or reverse a bankruptcy judge's judgment, order or decree, or remand with instructions for further proceedings. 11 U.S.C. Bankr.Rule 8013.

■■■ Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the Bankruptcy Court to judge the credibility of witnesses. 11 U.S.C. Bankr. Rule 8013; *In re Trans World Airlines, Inc.,* 145 F.3d 124, 131 (3d Cir.1998). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed."

*Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

■■■ The Bankruptcy Court's legal conclusions are subject to *de novo* review and its exercise of discretion for abuse thereof. *Trans World Airlines, id.; see also Bittner v. Borne Chemical Co.,* 691 F.2d 134 (3d Cir.1982). The allocation of the burden of proof with regard to establishing amounts of unreported income is a question of law subject to *de novo* review. *Bacon v. Commissioner,* 2001 WL 1178820, No. 00–3665, 2001 U.S.App. LEXIS 21882, *6 (3d Cir. Sept. 25, 2001)

## III. *LEGAL ANALYSIS*

On appeal, Mr. Xenakis raises four issues:

1. Whether the Trial Court erred in affording the IRS assessment a presumption of correctness when it was unable to produce any testimony or file to substantiate its deficiency assessment.

2. Whether the Trial Court erred in its allocation of the burden of proof where the Debtor has no access to the records that establish the claim.

3. Whether the Trial Court erred by allowing the IRS transcript and assessment to sustain a claim for gambling taxes without direct testimony that Mr. Xenakis actually received bets consistent with the amount of the assessment in accordance with 26 U.S.C. § 4401(c).

4. Whether the Trial Court's application of the burden of proof denied Appellant due process.

(Xenakis Brief at 1.)

I conclude that the Bankruptcy Court properly applied the law in determining that under 11 U.S.C. § 523(a)(7), the tax and interest due to the IRS were not dischargeable in bankruptcy. However, the Court failed to consider that the as-

sessment was unsubstantiated as to the amount of wagers received by Mr. Xenakis and erred by allowing this assessment to stand under the "presumption of correctness." Since the amount of the tax is a percentage of the amount wagered, the Court could not therefore properly conclude that Mr. Xenakis' debt to the IRS, even though not dischargeable, totaled $607,300.75 as stated in his order.

A. *Wagering Excise Tax and Dischargeability Thereof*

■ The Internal Revenue Service advised Mr. Xenakis in August 1995 that it was imposing a tax on the monies he allegedly handled as a bookmaker. Under 26 U.S.C. § 4401(a)(2), a federal excise tax of 2% is imposed on any wager not authorized by the law of the State in which the wager was accepted. "Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax ... on all wagers placed with him." 26 U.S.C. § 4401(c)[8]. Section 4401 is made specifically applicable to a "numbers game" by Section 4421(2). In addition, 26 U.S.C. § 4403 provides that each person liable for the wagering excise tax by virtue of § 4401 is required to keep "a daily record showing the gross amount of all wagers on which he is so liable, in addition to all other records required pursuant to section 6001(a)." *See Moten v. United States*, No. 206–77, 1982 WL 11295, *7, 1982 U.S. Cl.Ct. LEXIS 2331, *31–*33 (Sept. 20, 1982) for a discussion of Treasury Regulations 44.4401–2(a)(1), 44.4401–2(b) and 44.4403–1 related to record keeping. Section 6001, in turn, requires all taxpayers to "maintain adequate records

to permit the IRS to determine their tax liabilities, and when a taxpayer fails to maintain such records, the IRS may reconstruct income in any reasonable manner." *Bacon*, 2001 WL 1178820, 2001 U.S.App. LEXIS 21882 at *6. Section 6011(a) of the Tax Code requires anyone subject to taxes imposed by § 4401 to file a return entitled "Tax on Wagering," Form 730 and Treasury Regulation 44.6011(a) requires Form 730 to be filed on a monthly basis. *See Spain v. United States*, 182 B.R. 233, 234 n. 2 (Bankr.S.D.Ill.1995). Mr. Xenakis admitted that he did not pay the excise tax, did not keep the required records and did not file a Form 730 for each of the 20 months he laid-off bets for Sabatini. (T.T. 11, 20, 22.)

Section 523(a)(7) of the Bankruptcy Code provides that a discharge of debt otherwise available under Section 727[9] does not apply to a debt for a

> fine, penalty or forfeiture payable to and for the benefit of a governmental unit and [which] is not compensation for actual pecuniary loss, other than a tax penalty—(A) relating to a tax of a kind not specified in paragraph (1) of this subsection; or (B) imposed with respect to a transaction or event that occurred before three years before the date of the filing of the [bankruptcy] petition.

11 U.S.C. § 523(a)(7).

■ As Judge Markovitz pointed out, Mr. Xenakis' attempt to have the wagering excise tax and accrued interest thereon discharged under this provision of the tax code is "fundamentally flawed" because the section, by its express terms, applies only to certain penalties. *Xenakis*, 262 B.R.

---

**8.** There is also a special annual tax of $500 imposed on any person liable for taxes under § 4401. 26 U.S.C. § 4411.

**9.** Section 727 explains numerous grounds for denial of the discharge of debts in bankrupt-

cy, e.g., transfer or destruction of property, concealment of or failure to keep records, or refusal to answers questions concerning assets.

at 342. Judge Markovitz properly held that the penalty associated with the unpaid wagering excise tax should be discharged because the taxable events, i.e., the illegal gambling, occurred in 1989 through 1991, more than three years before Mr. Xenakis filed for bankruptcy. *Id.* at 346.

Section 523(a)(1)(B)(i) of the Bankruptcy Code provides that a discharge of debt otherwise available under Section 727 of the Code does not apply to a debt arising from taxes and interest if the debtor failed to file a return required with respect to that tax. *See Spain,* 182 B.R. at 235, concluding that excise taxes were not dischargeable pursuant to § 523(a)(1)(B)(i) because plaintiff had not filed the required Form 730. Judge Markovitz concluded that Mr. Xenakis appears to take the position that the "underlying tax and accrued interest do not fall within the scope of § 523(a)(1)(B)(i) and consequently are not excepted from discharge as a result of his involvement with Sabatini." *Xenakis,* 262 B.R. at 346. The Bankruptcy Court concluded that Mr. Xenakis was arguing that because he was only a middle-man who received no portion of the proceeds of bets laid-off for Sabatini, he was not required to file Form 730 tax returns and the purported debt was therefore dischargeable under § 523(a)(1)(B)(i). *Id.*

However, I believe that at trial, and certainly on appeal, Mr. Xenakis makes an important additional argument with regard to the underlying tax. That is, to the extent the tax is not dischargeable, it is improperly determined because there is no evidence to support the dollar amount of the wagers placed with him, i.e., the assessment is a "naked assessment." (T.T. at 50–51 and Xenakis Brief at 3–8.) Appellant argues that the Bankruptcy Court erred when it afforded the IRS assessment the "presumption of correctness" even though the government was unable to produce any testimony or file to substantiate its deficiency assessment. (Xenakis Brief at 8.)

### B. *Presumption of Correctness and the "Naked Assessment"*

■ A tax determined by the IRS, including a deficiency assessment, is generally afforded a presumption of correctness. *Anastasato v. Commissioner,* 794 F.2d 884, 886 (3d Cir.1986), *citing United States v. Janis,* 428 U.S. 433, 441, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); and *Baird v. Commissioner,* 438 F.2d 490, 492 (3d Cir.1970). The presumption of correctness "is a procedural device that places the burden of producing evidence to rebut the presumption on the taxpayer." *Anastasato, id.* In essence, the taxpayer's burden of proof and the presumption of correctness "are for the most part but the opposite sides of a single coin [which] combine to require the taxpayer to always prove by a preponderance of the evidence that the Commissioner's determination was erroneous." *Carson v. United States,* 560 F.2d 693, 695–96 (5th Cir.1977). Moreover, as a general rule, a court will not "look behind" the IRS assessment determination "even though it may be based on hearsay or other evidence inadmissible at trial." *Anastasato, id.*

■ There is, however, one exception to the general rule that courts will not examine the basis of the deficiency determination before recognizing the Commissioner's presumption of correctness. A court will not give effect to the presumption of correctness in a case involving unreported income if the IRS does not provide "some predicate evidence connecting the taxpayer to the charged activity."

*Gerardo v. Commissioner,* 552 F.2d 549, 554 (3d Cir.1977). Without such evidence, the presumption of correctness is based on an invalid "naked assessment" which cannot stand. *Anastasato,* 794 F.2d at 887. The Third Circuit has stated, "Given the obvious difficulties in proving the non-receipt of income, we believe the Commissioner should have to provide evidence linking the taxpayer to the tax-generating activity in cases involving unreported income, whether legal or illegal." *Anastasato, id.*

In the case which gave rise to the "naked assessment" concept, *United States v. Janis,* Los Angeles police officers seized $4,940 in cash and gambling records from bookmaker Max Janis. They then advised the IRS, who used the seized evidence to determine the gross volume of Janis' bookmaking activity for the five days immediately preceding the seizure, and, in turn, for the preceding 77 days during which he had been under surveillance by the police. Exclusively on that evidence, the IRS assessed wagering excise taxes under § 4401 in the amount of $89,026.09. *Janis,* 428 U.S. 433 at 434–437, 96 S.Ct. 3021. When criminal charges were filed against Janis for violation of local gambling laws, he successfully moved to quash the search warrant on the grounds that the affidavit of the policeman on which it was based did not set forth sufficient detail to enable the issuing magistrate to determine the reliability of the information. *Id.* at 437, 96 S.Ct. 3021. All items seized pursuant to the search warrant were ordered to be returned except the cash, which the IRS had taken in partial satisfaction of the assessment. *Id.* at 438, 96 S.Ct. 3021.

Janis filed a claim in tax court for refund of the $4,940; the IRS not only refused to honor the claim but counterclaimed for the unpaid balance of the assessment. Janis moved to suppress the evidence seized and to quash the assessment. At the hearing on the motion to quash, the district court concluded that because the evidence used by the IRS in making the assessment was illegally obtained, the assessment on which it was based was invalid and entered judgment for Janis. The Ninth Circuit affirmed and the Supreme Court granted certiorari to address two issues: the allocation of the burden of proof in a civil tax collection suit and the Fourth Amendment exclusionary rule. *Id.* at 438–440, 96 S.Ct. 3021.

The Court concluded that in a civil tax collection suit, as in refund suits and pre-assessment proceedings in the United States Tax Courts, the taxpayer bears the burden of proof, i.e., he must show that he is not liable for the tax which the government claims he owes. *Janis,* 428 U.S. at 440, 96 S.Ct. 3021. Furthermore, the presumption of correctness established in earlier cases such as *Welch v. Helvering,* 290 U.S. at 115, 54 S.Ct. 8, also applies. *Id.* at 441, 96 S.Ct. 3021. Thus, In the usual situation, where the taxpayer submits no evidence to demonstrate that the assessment was incorrect or to prove the correct amount, if any, of wagering excise tax, a court could not properly grant judgment in his favor. *Id.* Justice Blackmun, concluded, however, that Max Janis' case did not present the "usual situation:"

> What we have is a "naked" assessment without any foundation whatsoever if what was seized by the Los Angeles police cannot be used in the formulation of the assessment. The determination of tax due then may be one without rational foundation and excessive and not properly subject to the usual rule with respect to the burden of proof in tax cases.... Certainly proof that an assessment is utterly without foundation

is proof that it is arbitrary and erroneous.

*Janis,* 428 U.S. at 441–442, 96 S.Ct. 3021 (internal quotations and citations omitted).

The Court then concluded, "We are willing to assume that if the District Court was correct in ruling that the evidence seized by the Los Angeles police may not be used in formulating the assessment. . . . then the District Court was also correct in granting judgment for Janis in both aspects of the present suit." *Id.* at 442–43, 96 S.Ct. 3021.[10]

By August 1995, the IRS had apparently assembled sufficient information about Mr. Xenakis' alleged gambling activities to assess nearly $375,000 in unpaid wagering excise taxes for the period December 1989 through July 1991. However, the records were lost, as Judge McCullough determined at the pre-trial hearing on the motion to impose sanctions. (Bankruptcy Record, Item No. 15.) Judge McCullough ordered that the IRS could not introduce any evidence from that file at trial, but held open for the Trial Judge the issue of whether the assessments themselves could be admitted.

At the trial, Plaintiff's counsel approached Judge Markovitz about the pending motion to exclude the assessment. Judge Markovitz responded, "I'll take that under advisement. We'll hear what we hear today and we'll try to sort these matters out when I have some feel for the case. I don't think I can make a decision in that now without any information." (T.T. at 4.)

Later on in the trial, when Ms. Pickering, the IRS bankruptcy technician, had identified the literal transcripts she had ordered, Appellant's counsel objected to their introduction, stating:

> Your Honor, I object. At this time I'd like to make a formal objection. The witness is about to testify as to what I believe are hearsay statements by a third party as to a liability of Mr. Xenakis. In this case, we have specifically asked the IRS for their file . . . . . [T]he IRS has failed to produce it. We are not able to go beyond the hearsay statements made to the IRS through its agents or based on assumption. We have no way of cross examining them, and for the IRS to be allowed to introduce an assessment, would be to deny my client due process. I think under the totality of circumstances of this case, it would be manifestly unfair for this person to be able to testify about a conclusion some third party reached that we cannot get to the underlying basis for. I think the Court should preclude any testimony—

(T.T. at 29–30.)

Judge Markovitz overruled the objection (T.T. at 30) and allowed the literal transcripts to be admitted. Before he did so, however, he concluded that Ms. Pickering "is not able to testify as to the truth or falsity of [the transcripts], only that when she requested them, this is what she got. . . . She doesn't know as to whether they are accurate statements of tax due or not. . . . She's not able to say that these are activities as a result of Sabatini and/or Sabatini and/or Mr. Xenakis." (T.T. at 41–42.)

---

**10.** The Court then went on to reverse the Ninth Circuit and to hold that the seized evidence should not be excluded under the Fourth Amendment in making the deficiency assessment. "The judicially created exclusionary rule should not be extended to forbid the use in the civil proceeding of one sovereign [e.g., the federal government] of evidence seized by a criminal law enforcement agent of another sovereign [e.g., the state government]." *Janis,* 428 U.S. at 459–60, 96 S.Ct. 3021.

In his opinion, Judge Markovitz correctly stated the general law regarding the presumption of correctness. *Xenakis,* 262 B.R. at 343. He also noted that the "IRS produced no admissible substantive documentary evidence at trial indicating that debtor was involved in accepting illegal wagers. The only such evidence IRS offered was computer-generated 'transcripts' indicating that in August of 1995 it had assessed debtor for unpaid wagering taxes owed for each month from December of 1989 through July of 1991." *Id.* The Judge discounted Ms. Pickering's testimony as having "no weight" concerning the substance contained in the computer-generated assessments, concluding that "we only consider that she sought said assessments utilizing debtor's description and that the computer submitted assessments containing inadmissible information." He concluded, "Notwithstanding this, however, we are satisfied that the presumption of correctness attaches in this instance to the above assessment by IRS for unpaid excise tax owed by debtor for accepting illegal wagers." *Xenakis,* 262 B.R. at 344. This conclusion was based on the fact that Debtor admitted at trial that he wrote numbers on his own, albeit on a small scale; he admitted he was involved with Sabatini during this time and that Sabatini was in the business of writing numbers. "At the very least, such minimal predicate evidence suffices to link debtor to the type of tax-generating activity at issue in this case and provides a basis for the presumption that the assessments against debtor by IRS were correct." *Xenakis, id.*

Presumably, the missing file once contained sufficient information for the IRS to determine that Appellant received illegal wagers totaling $897,750 to $1,008,950 for each of the 20 months between December 1989 through July 1991, resulting in a two-percent tax of between $17,995 and $20,199. Unfortunately for the government, that evidence—whatever it may have been—was specifically excluded from admission at trial because the IRS admitted that it could not locate the underlying substantive information. The assessment, then, while it might at one time have been clothed, was naked at trial, thanks to the government's own action of misplacing the file and the decision of the hearing judge to exclude the underlying information.

The IRS devotes a great deal of effort to attempting to convince the Court that pursuant to the presumption of correctness doctrine, the burden of proof and persuasion remain at all times on Mr. Xenakis. (IRS Brief at 3–7.) I agree with that proposition. However, both the IRS and the trial judge overlooked the fact that the presumption itself only arises if there is concrete evidence on which it is based. Both the IRS and the Bankruptcy Judge apparently interpret *Janis* and its progeny to mean that as long as the taxpayer can be tied temporally to the illegal activities, that is sufficient to allow the presumption to stand. However, because the assessment is a specific calculation of tax, i.e., 2% of the illegal wagers, it must also be based on a specific volume of illegal activity to have any rational basis. Otherwise, the government would never need to present evidence of the amount of income derived from an illegal activity, but could merely estimate the amount based on other types of non-monetary evidence. Such unsubstantiated estimates are clearly improper. *See,* for instance, *Jackson v. Commissioner,* 73 T.C. 394, 403, 1979 WL 3735 (U.S.Tax Ct.1979) (finding the deficiency notice arbitrary and excessive when it was based only on an informant's highly suspect statements regarding the amount of heroin allegedly sold by plaintiff and describing the government's elaborate reconstruction of income as "sheer gossamer"); *Lucia v. United States,* 474 F.2d 565, 575

(5th Cir.1973) (concluding that there must be "some factual foundation" for the assessment, e.g., realistic projections, which may not be derived "Mandrake-like from a filament of evidence and subjected to a sleight-of-hand computation"); *Weimerskirch v. Commissioner,* 596 F.2d 358, 362 (9th Cir.1979) (the IRS could not rely on a naked assertion that the plaintiff received $30,000 from the sale of heroin without attempting to show from his net worth, bank deposits, cash expenditures, or source and application of funds that he had received such income); *Estate of Weller v. United States,* 58 F.Supp.2d 734, 741–42 (S.D.Texas 1998) (declaring void as "arbitrary and erroneous" tax deficiency estimates made by the IRS without any reference to the tax returns on which they were based).

Most cases in which *Janis* has been invoked have been concerned with whether the debtor was associated with the illegal events during the entire period for which the government made the assessment. In *DeCavalcante,* for instance, the taxpayer pled guilty in 1970 to conspiracy to operate an illegal gambling enterprise beginning in January 1965. *DeCavalcante v. Commissioner,* 620 F.2d 23, 24 (3d Cir.1980). Despite the fact that the government had no evidence of illegal gambling activity prior to July 1968, the IRS assessed a tax deficiency beginning in 1965, based solely on DeCavalcante's guilty plea and other statements he had made. *Id.* at 26. The Tax Court found that because of his guilty plea, DeCavalcante was estopped from denying his connection with gambling activities. However, the court also held that the government could not project the tax deficiency back to 1965 based solely on his statements and required the IRS to come forward with evidence of DeCavalcante's involvement in gambling activities during that period. Both parties appealed. *Id.* The Third Circuit upheld the Tax Court's decision regarding the evidence of involve-ment with gambling and agreed that the tax assessments for late 1968 and 1969 were not arbitrary. *Id.* at 27. The Commissioner argued on appeal that the assessment was entitled to the presumption of correctness because the tax for the period January 1965 to July 1968 had a rational basis, i.e., the volume of activity for the 1968–1969 period plus DeCavalcante's guilty plea regarding gambling activity in 1965–1968. *Id.* In rejecting this argument, the court held:

> [I]n order to give effect to the presumption on which the Commissioner relies, some evidence must appear which would support an inference of the taxpayer's involvement in gambling activity during the period covered by the assessment. Without that evidentiary foundation, minimal though it may be, an assessment may not be supported even where the taxpayer is silent .... While we realize the difficulties which the Commissioner encounters in assessing deficiencies in circumstances such as are presented here, we nevertheless must insist that the Commissioner provide some predicate evidence connecting the taxpayer to the charged activity if effect is to be given his presumption of correctness.

*DeCavalcante,* 620 F.2d at 27, *quoting Gerardo,* 552 F.2d at 554.

As the court concluded, "The essential point of *Gerardo* is that no inference is reasonable if it is wholly lacking of even a minimal factual basis." *DeCavalcante,* 620 F.2d at 28.

Numerous other cases, in the Third Circuit and elsewhere, affirm the position that an assessment is "naked" and "without rational basis" if, as a preliminary matter, the government fails to present evidence that the debtor was associated with the illegal activity during the entire period for which the tax is assessed. *See, e.g., Gerardo,* 552 F.2d 549; *Weimer-*

*skirch,* 596 F.2d 358; *Carson,* 560 F.2d at 698 ("If the record contains no item of proof tending to show that the taxpayer was engaged in wagering activity during the period assessed, the Commissioner's determination cannot prevail.") The courts in these instances have uniformly held that providing such evidence is a preliminary step to seeking the presumption of correctness and not an improper attempt by the taxpayer to shift the burden of production to the government. Excluding those cases where the plaintiff merely objects to the way in which the assessment has been calculated,[11] there are far fewer cases which question whether the monetary basis of the assessment is arbitrary or erroneous. However, two such cases are instructive because they directly address the underlying issue in this case.

In *Coleman v. United States,* 704 F.2d 326 (6th Cir.1983), the plaintiffs sought a refund of approximately $20,000 on their income taxes for 1963 and 1964. In connection with an audit of their tax returns, the Colemans delivered their financial records to the IRS; based on those records, the IRS assessed deficiencies against them. When the taxpayers sought to determine the basis for the assessment, the IRS admitted that it could not locate the financial records they had provided nor explain the assessment. *Id.* at 327. Several years later, threatened by the loss of their home through IRS attempts to foreclose its tax lien for the unpaid assessment, the Colemans paid the assessment then filed a refund claim in July 1976. In 1977, the financial records retained by the Colemans were destroyed in a flood. *Id.* When the refund claim was denied, the Colemans filed suit, arguing that the assessment was not entitled to its usual presumption of correctness because the IRS had absolutely no financial or other factual calculations to support it. The Sixth Circuit Court of Appeals concluded that the holding of *Janis* did not create an excep-

---

**11.** It is well established that in the absence of tax records which the taxpayer is required by law to keep, whether related to legal or illegal income, the government may use "any reasonable method" to reconstruct the amount of income in question. *See,* for instance, *Gerardo,* 552 F.2d 549, where the IRS calculated Gerardo's tax deficiency for unpaid gambling income using betting slips seized on February 2 and 3, 1967. From those, the Commissioner determined the average daily gross receipts of Gerardo's numbers game, projected that amount over the period April 4, 1966 through February 3, 1967, and assumed net profits of 30% of the gross wagering receipts. *Id.* at 552. Based on this calculation, the government projected gambling income for 1966 and 1967 of approximately $1.3 million and issued a deficiency notice which the Tax Court upheld. On appeal, Gerardo objected to the formula used by the Commissioner, arguing it was arbitrary and without rational foundation. *Id.* at 552, n. 6. The Court of Appeals noted that: "Since appellant kept no records, however, it was proper and indeed necessary to devise some substitute method for reconstructing income. Where unreported

income from gambling is at issue, the projection of average daily gross receipts over a period of time in order to calculate gross income is an acceptable method of reconstruction. Furthermore, Gerardo failed to sustain his burden of producing evidence which would have obviated the use of the Commissioner's formula. Therefore, we have concluded that the Tax Court did not err in approving the Commissioner's method of reconstruction." *Gerardo,* 552 F.2d at 552, n. 6. *See also, Dimauro v. United States,* No. 78–0–108, 1981 WL 1921, *6–*9, 1981 U.S. Dist. LEXIS 14414, *14–*21 (D.Neb. Aug. 3, 1981), explaining the "specific item method" and the "theoretical profit margin method" as alternative methods of reconstructing the amount of wagers accepted by the plaintiff; *Creech v. United States,* CA 95–cv–1491–MHS, 1995 WL 499461, *10, 1995 U.S. Dist. LEXIS 12082, *30 (N.D.Ga. Aug. 7, 1995), *citing Pinder v. United States,* 330 F.2d 119 (5th Cir.1964) for the proposition that "the IRS may utilize reasonable projections and extrapolations as means of computing tax liabilities. To hold otherwise would permit a tax liability to be evaded simply through poor record-keeping."

tion to the usual burden upon the taxpayer to prove the amount of the refund to which he is entitled, "rather it teaches that the burden is met when the assessment is shown to be more than merely erroneous; that is, an assessment is *per se* arbitrary and unenforceable when it is established that it is 'naked' and 'utterly without [evidentiary] foundation.'" The court then reversed the district court's decision in favor of the IRS, stating:

> The "specific evidence" demonstrating a total absence of an evidentiary basis for the imposed assessment here in issue is the government's explicit admission that it possessed no evidence whatsoever to support its conclusions. It is difficult to conceive more direct evidence of a "naked assessment without *any* foundation whatsoever" than the government's own concessions that it is without "any reports, work papers and other documents" to support its conclusions. (Emphasis added.) Accordingly, the Colemans have here satisfied their burden of proving that the assessment is arbitrary and so cannot be enforced.

*Coleman*, 704 F.2d at 329.

The second relevant case is *Portillo v. Commissioner*, 932 F.2d 1128 (5th Cir. 1991). Ramon Portillo was a self-employed painting subcontractor whose tax return for 1984 was audited by the IRS. As a result of that audit, the IRS determined that he had under-reported his income based on two discrepancies in his return. First, Portillo was unable to verify a business expenditure of $7,462 for painting supplies because his 1984 business ledger had been stolen from his pick-up truck and the paint store from which he purchased the supplies had lost or destroyed its duplicate copies of the sales slips. More damaging to Portillo's case, however, was a Form 1099 provided to the IRS by Navarro, a contractor who hired Portillo in 1984, indicating that he had paid Portillo $24,505 more than the taxpayer

indicated on his return. When Navarro's Form 1099 and Portillo's tax returns were compared, the government accepted Navarro's figure, even through Navarro was not able to document $21,380 in cash payments allegedly made to Portillo.

In applying the presumption of correctness analysis and the burden of producing evidence to rebut the presumption, the court noted that the presumption rests on the policy considerations of "the government's strong need to accomplish swift collection of revenues and . . . the need to encourage taxpayer record keeping." *Portillo*, 932 F.2d at 1133. The court went on to state:

> the need for tax collection does not serve to excuse the government, however, from providing some factual foundation for its assessments. . . . Several courts, including this one, have noted that a court need not give effect to the presumption of correctness in a case involving unreported income if the Commissioner cannot present some predicate evidence supporting its determination. . . . Therefore, before we will give the Commissioner the benefit of the presumption of correctness, he must engage in one final foray for truth in order to provide the court with some indicia that the taxpayer received unreported income.

*Id.*, citing *inter alia*, *Anastasato*, 794 F.2d at 887, *Carson*, 560 F.2d at 696, and *Weimerskirch*, 596 F.2d at 360.

The court concluded that the Commissioner's determination that Portillo had received unreported income of $24,505 was arbitrary because, faced with Navarro's inability to document $21,380 of that amount, the IRS had a duty to investigate Navarro's bald assertion that he paid this amount to Portillo in cash. *Id.* at 1134. Furthermore, the failure to substantiate the charge that Portillo had received unreported income, but simply to rely upon the

presumption of correctness, was inadequate. The notice of deficiency as to the alleged Navarro payment was declared arbitrary and erroneous and the lower court's decision in favor of the IRS reversed. *Id.*

Thus, both *Coleman* and *Portillo* teach that the presumption of correctness does not arise in a vacuum, but rather that it can only be granted when it rests on "some indicia" of income, or "some evidentiary foundation." As in *Coleman,* the specific evidence to support Mr. Xenakis' claim that the assessment is arbitrary and erroneous is "the government's explicit admission that it possessed no evidence whatsoever to support its conclusions." Moreover, the need for preliminary evidence applies not only to determination of the time period in which the income-producing activity is alleged to have occurred—as the Bankruptcy Court correctly stated—but also, as is clear from *Portillo,* to determination of the amount of income in question. *See also, Walker v. Commissioner,* 757 F.2d 36, 42 (3d Cir. 1985) (government must provide minimal predicate evidence that the plaintiff should be charged with all profits of an illegal business when other evidence showed that individuals besides Walker were involved in receiving the bets).

## C. *Mr. Xenakis' Tax Liability*

In the event that I agreed with his argument on appeal that this was a "naked assessment," Mr. Xenakis would have me declare the entire tax liability and the associated interest dischargeable. (Xenakis Brief at 13, seeking an order that he "has no liability to the Internal Revenue Service under 26 U.S.C. § 4401(a)(2).") I decline to do so.

The court in *U.S. v. Schroeder,* 900 F.2d 1144 (7th Cir.1990), was faced with a similar situation, that is, a demand that the taxpayer's entire tax liability be wiped out

if the deficiency assessment was found to be a "naked assessment." In that case, the IRS admitted that its initial assessment of tax deficiency had been incorrectly calculated and the taxpayer had been assessed $6,348.19 more than he actually owed. Schroeder sought to have the entire amended assessment of $124,900.75 declared void. The court concluded that two different analyses apply, depending on whether the assessment is incorrect but otherwise valid. "Proof that an assessment is incorrect does away with the government's presumption, it is true, but it does not wipe out the taxpayer's liability.... That liability is merely adjusted to coincide with the proof.... Barring special circumstances, if the defendants' liability *can be* calculated and enforced it *should be* calculated and enforced." *Schroeder,* 900 F.2d at 1148 (emphasis in original). On the other hand, if the taxpayer's liability cannot be calculated at all because there is no evidence upon which such a calculation can be based, it is "arbitrary in the sense that the calculation has no support and the true amount of tax owed is incapable of being ascertained." The Court specifically pointed out that "where records supporting an assessment are excluded from evidence [citing *Janis* ] or are nonexistent [citing *Coleman* ], so that the basis upon which an assessment is calculated is beyond the knowledge of the court, the assessment is ... beyond saving." *Id.* at 1149. *See also U.S. v. Craig,* 936 F.Supp. 298, 299 (E.D.Pa.1996), *citing Schroeder* for the principle that even though a taxpayer demonstrates that an assessment is erroneous, it is not voidable because it is incorrect, but will be adjusted to reflect the proper liability.

Here, we have a mixed case. There is no evidence to support the Commissioner's position that Mr. Xenakis received wagers at an average rate of approximately $1,000,000 a month for twenty months because any such evidence that might once

have existed to support that amount has been lost and ruled inadmissible by the Bankruptcy Court. However, there is an admission by Mr. Xenakis at trial that he acted as a middle-man in laying off bets at the rate of $800 or so a week for Sabatini and ran his own numbers during this period at the rate of $150 to $200 a week. (T.T. 9, 17–18.) These admissions under oath would provide the necessary predicate evidence for the IRS to make a valid projection of monthly wagers for December 1989 through July 1991, when there is no question that Mr. Xenakis engaged in illegal gambling activities. The burden to show by the preponderance of the evidence that he was not liable for wagering excise tax under § 4401 because he transferred all the winnings to Sabatini (as he testified) will rest with Mr. Xenakis. Thus, it would appear that some wagering excise tax and interest thereon may be determined on evidence which the IRS currently has.[12] As noted above, such taxes and interest are not dischargeable under § 523(a)(1)(B)(i). The case is remanded to the Bankruptcy Court for reconsideration of Mr. Xenakis' true tax liability.

Because I have concluded that the tax assessment by the IRS was not entitled to the presumption of correctness and must therefore be set aside as a "naked assessment," I need not consider Mr. Xenakis' other arguments raised as to Count I. The Bankruptcy Court's conclusion regarding the so-called "inaccurate proof of claim" was correctly decided as a matter of law in Count II but that analysis and conclusion are irrelevant to the outcome on appeal.

### ORDER OF COURT

And now, this **16th** day of November, 2001, after careful consideration and for the reasons set forth in the Opinion accompanying this Order, it is ordered that the Appeal from the Order of the Bankruptcy Court dated March 28, 2001, in the matter of *Xenakis v. United States*, Bankruptcy No. 00–207730BM, Adversary No. 00–2262–BM, is granted to the extent that the Bankruptcy Court erred in its determination of the amount of the debt owed by Debtor to the United States Internal Revenue Service for unpaid excise taxes imposed for accepting illegal wagers and for pre-petition interest accrued thereon. The case is remanded for further determination, in light of the Opinion attached hereto, of the correct amount of taxes and interest owed, if any. In all other regards, the opinion of the Bankruptcy Court is affirmed.

---

**12.** Nothing in this paragraph is intended to limit evidence as to the extent of Mr. Xenakis' wagering activity to statements made in the bankruptcy trial. There may be other evidence which does not appear in the record as presented on appeal but which may be pertinent to his tax liability.