# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CARL E. CHASTAIN,<br><br>               Appellant,<br><br>   v.<br><br>DEPARTMENT OF LABOR AND INDUSTRIES OF THE STATE OF WASHINGTON,<br><br>               Respondent. | No. 52126-1-II<br><br><br><br>UNPUBLISHED OPINION |

LEE, J. — Carl E. Chastain appeals the superior court's order granting of summary judgment in favor of the Department of Labor and Industries (Department) after he had a stroke at work and was denied benefits, arguing that the superior court erred by (1) making a credibility determination and (2) concluding that his stroke was not an injury under RCW 51.08.100. Because the superior court did not make a credibility determination and because Chastain's stroke is not an injury under RCW 51.08.100, we affirm.

## FACTS

### A. CLAIM HISTORY

On April 5, 2016, Chastain had an acute ischemic stroke. The stroke occurred while he was at work after five especially stressful weeks at the Pacific Coast Salmon Coalition, where he

was the executive director. Chastain filed a claim for benefits with the Department claiming that the stress from his job caused the stroke.

In his claim, Chastain reported that his injury was a condition that developed "[g]radually [o]ver a [p]eriod of [t]ime." Administrative Record (AR) at 70. He had been experiencing discomfort for two years. He stated that "multiple audits and reviews by various agencies in accordance with board directives and state laws" caused his condition. AR at 70. He was doing his regular job when he was injured and was on the employer's premises. He would be out of work for a year.

On May 26, 2016, the Department rejected Chastain's claim for benefits as an industrial injury or occupational disease for the following reasons:

> That there is no proof of a specific injury at a definite time and place in the course of employment.
>
> That claimant's condition is not the result of an industrial injury as defined by the industrial insurance laws.
>
> That the claimant's condition is not an occupational disease as contemplated by section 51.08.140 RCW.
>
> Any and all bills for services or treatment concerning this claim are rejected, except those authorized by the department.

AR at 37. After Chastain filed a Protest & Request for Reconsideration, the Department reconsidered its decision and determined that the first order was correct on June 14, 2016.

B. BOARD PROCEEDINGS

Chastain appealed to the Board of Industrial Insurance Appeals (BIIA). The Department moved for summary judgment. The Department argued that Chastain did not suffer an industrial injury as defined by RCW 51.08.100.

Chastain's response to the Department's motion for summary judgement included three declarations. These declarations noted Chastain's unusually high stress levels beginning in February 2016 due to a potential loss of funding. And Chastain's treating physician, Dr. Wilbert James, stated that this stress was a causative factor of Chastain's stroke.

After hearing arguments on the Department's motion for summary judgement, the BIIA Judge denied the motion because there were genuine issues of material fact. Specifically, the BIIA Judge noted that "Dr. James' potential testimony directly linking changes in Mr. Chastain's blood pressure to his increased work-related stress may create a circumstance requiring the tribunal to weigh credibility on a material issue regarding causation and makes summary judgment inappropriate." AR at 135. The BIIA Judge held a full hearing the merits of Chastain's claim for benefits.

1. Evidence Regarding Chastain's Stress Before the Stroke

At the hearing on the merits, Chastain testified that he had worked at the Pacific Coast Salmon Coalition for twenty years. He used to work 40 hours per week. Before 2016, he was in good health and used to work out in the field about 50% of the time. He had high cholesterol and high blood pressure before the stroke.

The Pacific Coast Salmon Coalition was a 501(c)(5) non-profit. Their sources of funding were the Washington Department of Fish and Wildlife (WDFW) and the Recreation Conservation Office (RCO). In late 2015, Jeannie Abbott came to WDFW and, in early 2016, began demanding documents that no one had asked for before. Chastain received an e-mail on February 12, 2016 listing the tasks he had to complete. Abbott gave them a month to complete the tasks which should have taken a year and a half to two years under industry standards. One of the tasks involved

3

changing the nonprofit from a 501(c)(5) to a 501(c)(3). If Chastain did not get the projects done, their funding would be cut all together. According to Chastain, "it became extremely difficult." AR (Trial, Jan. 27, 2017) at 22.

Prior to Abbott, Chastain had not had major problems with funding from WDFW. After a meeting with Abbott in February 2016, Chastain asked his board to fire him because he felt he was ineffective. He felt ineffective because "no matter what I did she would hit me with something else." AR (Trial, Jan. 27, 2017) at 27. Chastain's board did not fire him and told him to keep going. Chastain did not quit. He began working a minimum of 80 hours per week. He called the president of the Regional Fishery Enhancement Group Coalition, an independent group, and asked them to mediate with WDFW. Chastain was told, "You're on your own." AR (Trial, Jan. 27, 2017) at 67. This environment continued through April 5. During that five-week period between February and April, Chastain was not doing anything new but was under a new level of scrutiny. According to Chastain, Abbott's demands were hostile and he felt that "she was harassing" him." AR (Trial, Jan. 27, 2017) at 85. It felt personal. He had never felt that kind of pressure in his life.

Chastain had faxed the 501(c)(3) paperwork seconds before his stroke. Chastain stated that had he been fired at the end of February 2016, he does not believe he would have had the stroke.

Heather Lewis, the financial manager of Pacific Coast Salmon Coalition, testified that Chastain had been her boss for four years. The stress had increased between February 2016 and April 5, 2016. During that five week period, Chastain hardly smiled. But she never saw him get upset. She could tell he was stressed from his body language. Chastain would always get stressed during audit periods and nothing felt different about 2016; it was in line with how things were in 2013, 2014, and 2015. However, the deadline for the 501(c)(3) was causing more stress than other

deadlines in other years. She testified that right after they had faxed the 501(c)(3) papers, Chastain started feeling dizzy. Lewis called Chastain's wife and then the ambulance.

Staci Chastain, Chastain's wife, testified that Chastain usually worked about 30 to 40 hours per week. He spent more than half of his workdays outdoors. Before 2016, he had an average level of stress. After Abbott came on, the work started ramping up. Just before he had his stroke in early 2016, Chastain's working hours changed to 60 to 80 hours per week. In early 2016, "That's when I started to notice that . . . he started to talk more and more about it at home. It was a never-ending story. I mean, he was getting phone calls 24/7 from everybody, from contractors, volunteers, staff, things like that." AR (Trial, Jan. 27, 2017) at 108. His temper at home was elevated, and he did not sleep well at night. She felt that Chastain was being harassed at work. Abbott was singling him out and every document that Chastain provided was not good enough.

In the Labor and Industries claim form, Staci[1] wrote that Chastain had suffered two years of pain and discomfort due to stress from coordinating with multiple funding agencies and board directives because that is when his job changed. But the job did not get more stressful until Abbott joined. Chastain did not quit in 2016 because they had no other source of income. If he got fired, he could apply for unemployment.

Alex Huelsdonk, the current executive director of the Pacific Coast Salmon Coalition, had been working at the organization since 2005. Chastain had been his boss. Work usually did not appear to stress Chastain out. Chastain was "despondent" in February and March of 2016. AR (Trial, Jan. 27, 2017) at 136.

---

[1] For clarity, because this witness has the same last name as the appellant, we refer to her by her first name. No disrespect is intended.

Huelsdonk began acting as executive director on April 10, 2016. He has had both good and bad interactions with Abbott. Sometimes her expectations are unreasonable. After he took over for Chastain, Huelsdonk had to ask for extensions on deadlines but had difficulty meeting the extended deadlines. Huelsdonk has been able to meet the requirements of the executive director job working 40 hours per week. But Chastain had accomplished many of the tasks before his stroke, and Huelsdonk only had to finalize the tasks.

2.      Evidence Regarding the Cause of the Stroke

Wilbert James, M.D., was Chastain's treating physician and testified in a deposition that Chastain had been coming to his office for several years. The last time Dr. James saw him before the stroke was in October 2015, and Chastain had high blood pressure. The next time Dr. James saw Chastain was on May 3, 2016, after Chastain had been discharged from the hospital to discuss a treatment plan for physical and occupational therapy. Chastain's stroke was caused by a blood clot. High blood pressure can put one at risk of a stroke. He is not sure if Chastain's high blood pressure caused his stroke or not. For Chastain, his risk factor for having a stroke was high blood pressure. Before the stroke, Chastain did not take his blood pressure medication the way it was prescribed. The risk factors for Chastain's high blood pressure were "[b]eing a male, getting older, being obese and being in stress." AR (Deposition, James, Jan. 26, 2017) at 16. It is multifactorial.

Dr. James believes that stress was "a causative factor in his stroke." AR (Deposition, James, Jan. 26, 2017) at 19. "Stress has actually been studied and is considered in and of itself a risk factor for stroke with some studies." AR (Deposition, James, Jan. 26, 2017) at 16. Stress can also be a cause of high blood pressure. Chastain also had elevated blood sugar levels which is caused by stress. Chastain's blood pressure has been normal since the stroke. And Chastain had

the same dosage of blood pressure medication before and after the stroke. "[W]hen he was on the job, his blood pressure was high. And now he's off the job, his blood pressure is lower. That's a definite observation. Everything's multifactorial, but—pretty straightforward." AR (Deposition, James, Jan. 26, 2017) at 25. There is no objective way to measure stress; it is not quantifiable.

Chastain told Dr. James that he had undue stress, and Dr. James has no reason to discredit it. Dr. James could not say if stress was absolutely the cause of Chastain's stroke, but it was causative. Dr. James thought it would be appropriate for Chastain to get an independent medical exam from a neurologist because Dr. James could not make the determination as to what exactly caused the stroke. "I'm a family practice doctor. You know, I don't—I only know what my patients tell me with regards [sic] to how their life is." AR (Deposition, James, Feb. 23, 2017) at 68. The fact that Chastain felt harassed and worked twice as much as usual the five or six weeks before the stroke are consistent with the report of undue stress.

Tom Kushner, DO, testified in a deposition that he works at the Swedish Spine Institutes. He is the stroke clinic doctor, a neurologist. Chastain was a patient at the stroke clinic. Dr. Kushner saw Chastain a couple of months after his stroke. Chastain had an ischemic stroke or more specifically a lacunar stroke. A lacunar stroke is where high blood pressure and diabetes cause blockages in small arteries. Blood pressure was the number one factor in the cause of Chastain's stroke. Another risk factor for Chastain was obesity. Chastain also had a history of high cholesterol. Chastain's hemoglobin A1c indicated that he had early diabetes.

Dr. Kushner stated that stress is a nonspecific issue, so it is not what he looks at as a stroke risk factor. "I wouldn't look at stress as being the cause of the stroke. And to some extent his . . . not regular use of medication would be the factor that would be most important in terms of the

cause of his stroke as opposed to stress." AR (Deposition, Kushner, Mar. 7, 2017) at 18. By the time Dr. Kushner saw him, Chastain's blood pressure had been normalized, as a result of the medication. Being in very intense and stressful work conditions for five weeks would unlikely cause the elevated blood pressure numbers. This is because the number one recommendation to patients with high blood pressure is to reduce salt, lose weight, and take medication, not reduce stress. Stress can cause transient elevated blood pressure levels but that does not cause prolonged elevated blood pressure levels.

Dr. Jeffrey A. Wallhoff, is an emergency room physician at Forks Community Hospital. He testified that Chastain came into the emergency room with symptoms and signs of a stroke. He treated Chastain for an ischemic type of stroke. Chastain had not been taking his blood pressure medication for some time. Chastain's speech was slurred when he was in the emergency room, so it was difficult to communicate with him. He treats the symptoms but it is not his role to figure out the cause of the stroke.

Dr. Wallhoff filled out Chastain's L&I claim form. He wrote that it was not a work-related injury. This is because

> the causes of . . . stroke are not something that is—happens suddenly. . . . It happens over time with damage to the blood vessels due to high blood pressure, smoking, obesity, you know, cholesterol, genetics, and all those things take time, and so it— work is not considered a, you know, a cause of stroke.

AR (Deposition, Wallhoff, Mar. 24, 2017) at 14. "So could stress have some part to play in high blood pressure and a stroke, yes, it could, but as to stress being a common cause of stroke, it's not, you know, thought of as a cause of stroke." AR (Deposition, Wallhoff, Mar. 24, 2017) at 15.

The BIIA Judge entered a Proposed Decision and Order on June 8, 2017.[2] On August 10, 2017, Chastain appealed the Board decision "on the grounds that said Order is unjust and unlawful under title 51 and WAC 296, and the June 9, 2017 order is not supported by the record or evidence, to be shown by proof hereinafter offered." Clerk's Papers (CP) at 43-44.

C.     SUPERIOR COURT PROCEEDINGS

On March 16, 2018, the Department filed a motion for summary judgment with the superior court. The superior court granted the motion for summary judgement in an oral ruling. The superior court found that Dr. James's testimony was not "compelling enough to deny the Summary Judgement Motion." Verified Report of Proceedings (VRP) at 28. Specifically, it noted that "Dr. James offered the opinion and he offered the opinion that he believed that the stroke was stress related although he kind of shoots himself in the foot then by saying go talk to another doctor." VRP at 27-28.

On June 15, 2018, the superior court entered an order granting the Department's motion for summary judgment. The order stated, in relevant part:

> C.     Though Mr. Chastain had a challenging working relationship with a representative from the Washington Department of Fish and Wildlife, this relationship did not rise to the level of being a proximate cause of his stroke.
> D.     Mr. Chastain's attending physician, a general practitioner form [sic] Forks, Washington, testified that stress was a proximate cause of Mr. Chastain's stroke. However, the Court finds that Dr. James's testimony does not create a significant issue of material fact because he testified that a specialist in neurology would be better qualified to determine causation of the stroke. The Court found there to be no objective evidence that linked the five weeks of heightened stress to the stroke Mr. Chastain suffered.
>
>     . . . .

---

[2] The final Decision and Order is not included in the record.

G.     A preponderance of the evidence demonstrates Mr. Chastain did not suffer from a sudden and traumatic happening while at work that proximately caused his stroke. The stroke Mr. Chastain suffered was unrelated to his employment.

CP at 13-14.

Chastain appeals.

ANALYSIS

A.    LEGAL PRINCIPLES

In reviewing a BIIA decision under the Industrial Insurance Act, the superior court considers the issues de novo, relying on the certified board record. *Watson v. Dep't of Labor & Indus.,* 133 Wn. App. 903, 909, 138 P.3d 177 (2006). The superior court's ruling is subject to the ordinary rules governing civil appeals. RCW 51.52.140; *Romo v. Dep't of Labor & Indus.,* 92 Wn. App. 348, 353, 962 P.2d 844 (1998).

The appellate court reviews the superior court's grant of summary judgment de novo to determine whether the evidence shows "'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Romo,* 92 Wn. App. at 354 (quoting CR 56(c)). A material fact is one on which the outcome of the litigation depends. *Kinney v. Cook*, 150 Wn. App. 187, 192, 208 P.3d 1 (2009). "[T]he trial court does not weigh evidence or assess witness credibility. Neither do we do so on appeal." *Barker v. Advanced Silicon Materials, LLC,* 131 Wn. App. 616, 624, 128 P.3d 633, *review denied,* 158 Wn.2d 1015 (2006).

"[W]hile a court should not resolve a genuine issue of credibility at a summary judgment hearing, '[a]n issue of credibility is present only if the party opposing the summary judgment comes forward with evidence which contradicts or impeaches the movant's evidence on a material

issue.'" *Laguna v. State*, 146 Wn. App. 260, 266, 192 P.3d 374 (2008) (citing *Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 626, 818 P.2d 1056 (1991)).

> The party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and that the opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof.

*Amend v. Bell*, 89 Wn.2d 124, 129, 570 P.2d 138 (1977) (quoting *Rinieri v. Scanlon*. 254 F. Supp. 469, 474 (S.D.N.Y. 1966)).

B.    CREDIBILITY

Chastain argues that the superior court erred in making a credibility determination with regard to Dr. James's testimony as to the cause of the stroke. Chastain relies on the fact that the superior court stated in its oral ruling, "Dr. James offered the opinion and he offered the opinion that he believed that the stroke was stress related although he kind of shoots himself in the foot then by saying go talk to another doctor." VRP at 27-28. We disagree.

Here, the Department, the moving party, presented evidence that stress did not cause Chastain's stroke. Dr. Kushner, a neurologist, testified that blood pressure was the number one factor in the cause of Chastain's stroke. Other risk factors for Chastain were obesity and high cholesterol. Dr. Kushner said, "I wouldn't look at stress as being the cause of the stroke." AR (Deposition, Kushner, Mar. 7, 2017) at 18. Being in very intense and stressful work conditions for five weeks would unlikely cause the elevated blood pressure numbers that Chastain had. Stress can cause transient elevated blood pressure levels but that does not cause prolonged elevated blood pressure levels. Dr. Wallhoff testified that "So could stress have some part to play in high blood pressure and a stroke, yes, it could, but as to stress being a common cause of stroke, it's not, you

know, thought of as a cause of stroke." AR (Deposition, Wallhoff, Mar. 24, 2017) at 15. Dr. Wallhoff also testified that he did not think Chastain's stroke was a work-related injury because a stroke does not happen suddenly.

Chastain, the nonmoving party, presented evidence from Dr. James, who stated that he believes stress was "a causative factor in his stroke." AR (Deposition, James, Jan. 26, 2017) at 19. Dr. James based this belief on his observation that Chastain's blood pressure was high when he was working and is lower now that he has left his job. But Dr. James also stated that Chastain's stroke was caused by a blood clot. And Dr. James acknowledged that it would be appropriate for Chastain to get an independent medical exam from a neurologist because he could not make the determination as to what exactly caused Chastain's stroke. Thus, while stress was a causative factor, Dr. James could not say if stress was the cause of Chastain's stroke.

Because Dr. Kushner was the only doctor that made a determination as to the cause of Chastain's stroke, it is an undisputed material fact. While Dr. James said that stress was a causative factor, he did not make a determination that stress caused Chastain's stroke. Rather, he stated that the cause of Chastain's stroke was a blood clot. And he deferred to a neurologist to make the determination as to what caused Chastain's stroke. Thus, the cause of the stroke was not factually disputed, and the superior court did not make a credibility determination with the challenged statement.

C.     INJURY

Chastain argues that he suffered an injury under RCW 51.08.100. He contends that an injury must be connected to a specific timeframe "such that it subjects that time frame to

investigation." Br. of App. at 10. Chastain connects his stroke to the five weeks prior which were unusually stressful.[3] We disagree.

Under RCW 51.08.100 "'Injury' means a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical conditions as result therefrom." RCW 51.08.100 requires a sudden happening in order for an injury to have occurred.

Here, neither party argues that there was a sudden happening. Therefore, Chastain has failed to show an injury as required under the language of the statute.

However, courts have found cerebral vascular accidents or strokes may qualify as an injury under RCW 51.08.100. When the medical testimony shows the worker suffered from a long-term medical condition, the injury must be caused by an "unusual exertion" "necessary to place the injurious result within the ambit of a 'sudden and tangible happening, of a traumatic nature' required by RCW 51.08.100." *Spino v. Dep't of Labor and Indus.*, 1 Wn. App. 730, 735-36, 463 P.2d 256 (1969), *review denied*, 77 Wn.2d 962 (1970) (quoting RCW 51.08.100). Unusual exertion requires "'more than ordinary exertion.'" *Id*. at 734 (quoting *Metcalf v. Dep't of Labor and Indus.*, 168 Wn. 305, 308, 11 P.2d 821 (1932)).

Case law has limited the "unusual exertion" to a single event. *See Sutherland v. Dep't of Labor and Indus.*, 4 Wn. App. 333, 336-37, 481 P.2d 453 (1971); *Rothwell v. Nine Mile Falls Sch. Dist.*, 173 Wn. App. 812, 821-22, 295 P.3d 328 (2013). *See also Garrett Freightlines, Inc. v. Dep't*

---

[3] Neither party argues that Chastain suffered an occupational disease.

*of Labor and Indus.*, 45 Wn. App. 335, 343-44, 725 P.2d 463 (1986) (noting that recurrent trauma seems inconsistent with a "sudden and tangible happening.").

In *Sutherland*, Sutherland engaged in four months of bargaining negotiations for a contract, culminating in a meeting of union members. 4 Wn. App. at 336. The lengthy meeting involved an unusual level of emotional tension, and Sutherland died of a coronary inclusion immediately after the meeting concluded. *Id*. at 336-37. The court set forth the relevant issue to be whether Sutherland died as a result of the unusual emotional tension he experienced at that meeting that immediately preceded his death. *Id*. at 337-38. If the events at the meeting were "a normal part of a business representative's function," then Sutherland's death was not an injury under RCW 51.08.100. *Id*.

In *Rothwell*, Rothwell, who was employed as a custodian at a high school, cleaned the scene of a suicide of a victim she knew, checked the classrooms for a bomb, guarded the school gates as counselors assisted students with their grief, and picked up the mementos left outside of the school. 173 Wn. App. at 814-16. The court held that the multiple events after the suicide did not create a traumatic event. *Id*. at 821. However, the court held that the single event of cleaning up the scene of the suicide, which included removing medical supplies, brain matter, blood, and pieces of bone was "a sudden, tangible, and traumatic event that caused an immediate result." *Id*.

Here, Chastain had existing medical conditions—high blood pressure, obesity, and high cholesterol. Because the injury was a stroke, the injury had to be caused by an unusual exertion.

Chastain presented evidence that he started working twice the number of hours. He began working 80 hours per week, rather than 40 hours per week. And he felt harassed. He had never felt that kind of pressure in his life. He was "despondent" in February and March of 2016, while

usually work did not stress him out. AR (Trial, Jan. 27, 2017) at 136. He hardly smiled. His wife noted that he began to talk about work much more at home than he had before. The five weeks before his stroke became "extremely difficult" because he had to complete tasks in a month which should have taken one to two years to complete. AR (Trial, Jan. 27, 2017) at 22. No matter what he did, "she would hit me with something else." AR (Trial, Jan. 27, 2017) at 27. However, this evidence was not limited to a single event.

Unlike in *Sutherland and Rothwell*, there is no evidence that points to a single event that can be characterized as an "unusual exertion" within the ambit of a "'sudden and tangible happening of a traumatic nature'" that caused Chastain's stroke. *Spino*, 1 Wn. App. at 735-36 (quoting RCW 51.08.100). One of the tasks Chastain had to complete was changing the nonprofit from a 501(c)(5) to a 501(c)(3). Lewis noted that the deadline for the 501(c)(3) was causing more stress than other deadlines in other years. Chastain was faxing the 501(c)(3) paperwork seconds before his stroke. While Chastain had completed a specific task right before his stroke, there is no evidence that the task of faxing the 501(c)(3) papers itself was so stressful that it caused the stroke. Rather, the evidence shows that, generally, the five weeks leading up to the stroke were stressful. There is no evidence of any happening that qualifies as a single event as carved out in *Sutherland* and *Rothwell*. Therefore, there is no evidence to show that there was an unusual exertion in a single event that caused Chastain's stroke; thus, there was no injury under RCW 51.08.100.[4]

---

[4] Chastain also argues that the unusual circumstances at work proximately caused his stroke. However, because we hold that Chastain failed to show an injury as required under RCW 51.08.100, we need not address this argument.

No. 52126-1-II

We hold that the superior court did not make a credibility determination and Chastain's stroke was not an injury under RCW 51.08.100. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, C.J.

Sutton, J.